THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KERWIN D. DOSS, Defendant-Appellant.

Third District   No. 3—02—0033

Opinion filed March 31, 2004.

Kenneth D. Brown (argued), of State Appellate Defender's Office, of Ottawa, for appellant.

Jeff Tomczak, State's Attorney, of Joliet (Lawrence M. Bauer and Robert M. Hansen (argued), both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SCHMIDT delivered the opinion of the court:

Defendant Kerwin Doss was convicted of armed robbery (720 ILCS 5/18—2(a) (West 2000)) by a Will County jury. He appeals.

## I. BACKGROUND

On February 2, 2001, defendant Kerwin Doss was charged in a criminal complaint with armed robbery. The complaint alleged that on December 27, 2000, defendant took a purse from Melani Vetter while he was armed with a black handgun. An amended complaint was filed on February 5, 2001, again alleging the defendant took a purse from Melani Vetter while he was armed with a black handgun.

On February 15, 2001, a 20-count indictment was filed. Two of the counts were directed against defendant. Count IV charged the defendant with armed robbery in that, on or about December 27, 2000, the defendant, while armed with a toy pistol, knowingly took a purse from the person of Melani Vetter by threatening the imminent use of force. Count XIV charged the defendant with aggravated robbery in that, on or about December 27, 2000, the defendant, while indicating by his actions to Melani Vetter that he had a firearm, knowingly took a purse from Vetter by threatening the imminent use of force. Defendant was arrested and taken into custody on March 2, 2001.

On July 2, 2001, the parties appeared in court and announced that they were ready for trial. Before proceeding to trial, however, the prosecutor made an oral motion to amend count IV of the indictment. The prosecutor requested that the word "toy" be stricken as being surplus language. Defense counsel objected. Defense counsel argued that, since the defense preparation had been based upon the allegation that the defendant used a toy gun, amending the indictment on the day of trial would prejudice the defendant dramatically. The prosecutor responded that he had discussed the issue with defense counsel on the previous Friday afternoon, at which time he told counsel that the toy gun in evidence was not the gun he would allege was used in the crime. The prosecutor said he intended to argue at trial that a black handgun, as identified by the victim, was used by the defendant.

The trial court denied the motion. The court found that it would be fundamentally unfair to allow the amendment requested by the State at such a late stage. The court then went on to grant the prosecutor's motion for a continuation, over a defense objection. The court noted that the State had a right to address its charging issues if it believed it was within the speedy trial term.

On July 12, 2001, a first superceding bill of indictment was filed, charging the defendant with one count of armed robbery and one count of aggravated robbery. Count I charged the defendant with armed robbery claiming the defendant, while armed with a pistol, knowingly took a purse from the victim by threatening the imminent use of force.

On September 13, 2001, the trial court, over a defense objection, allowed the State's motion to use as evidence a black Detroit Tigers starter jacket the defendant was wearing on the date he was arrested.

The defendant's cause proceeded to a jury trial on September 13, 2001. Prior to jury selection, the following exchange then took place:

"THE COURT: Now Mr. Doss, if you want to join your counsel at the counsel table, and you should remove his cuffs.

THE COURT OFFICER: Shackles off too or just the handcuffs?

THE COURT: No, just the cuffs. His legs are shackled but the tables prevent that from being viewed by the jury."

The victim testified at trial that on December 27, 2000, she arrived at home and parked in front of her house after trips to a grocery and convenience store and saw a man running in her direction. After shutting the car door, a man put a gun to her temple and told her to give him the money. She said the gun was a black handgun with a cylinder that felt like a small metal gun against her head. She also said that the man was wearing a black winter cap on his head and a black sports jacket with a team logo in silver writing on the front. When the man first put the gun to her head, she thought it was a joke and turned and looked at the man's face.

After the man saw that she had a purse, he told her to give it to him, which she did. Next, the man told her to give him her car keys. The man threw the keys in the middle of the street. The man then turned around and ran south on Nicholson Street.

The victim further testified that on the night of the incident, she met with Detective Bruce Larson. They made arrangements for her to go to the Joliet police department the next morning to do a composite sketch. She met with Detective Larson again the next morning. He asked her questions about the robber's face and made a drawing of the robber. She identified People's Exhibit No. 3 as the drawing. She testified that after the detective drew it, he asked her how close the

likeness was to the person who robbed her, on a scale of "1 to 10." She said it was an "8."

The victim stated that she met with Detective Larson again about 31 days later. At that time, he showed her some photographic lineups. She was able to identify a person from one of the lineups. When she saw the picture in the lineup, she told Detective Larson that she "knew it was him." She identified the defendant in court as the person who robbed her. She also identified People's Exhibit No. 5 as the coat the defendant was wearing that night. She further noted that a streetlight to the south of where she parked on the night of the robbery was working on that date.

On cross-examination, the victim testified that it was dark out when the incident occurred because it happened close to 7 p.m., two days after Christmas. When she met with Detective Larson on the day after the robbery to do a sketch, he asked her questions about what the robber looked like. At that point, she was unsure what the man's eyebrows looked like. She stated that the man's hair, ears, and forehead were covered by a cap which was just above the eyebrows. She did not observe any facial hair.

She described the man's lips as they were depicted in the composite. She believed the man's lips were small, his face was round, and his nose was kind of pointed. She was confident the man was an African-American. She testified that the black-and-silver coat the robber was wearing was not unique and that other people have the same kind.

She admitted that the person she picked out of the lineup did not look like the person in the composite sketch, except for the eyes. She stated that the person she described in the sketch and the person she picked out of the lineup 31 days later were "not really close at all." After she gave the composite sketch, she never called the police to say that it might be wrong.

On redirect examination, the victim testified that she was 100% sure that the person she pointed out in court was the person who robbed her. On re-cross-examination, she testified that she had not seen the defendant at all since the photographic lineup and denied having seen him before in court. She added that the composite sketch did not look like the defendant.

Joliet police officer Dennis McWherter testified that on March 2, 2001, he and Officer Tichy went to the area of "Second and Richards." They were looking for the defendant, who was wanted on a warrant. Officer McWherter was in plainclothes in an unmarked police car. He recognized the defendant from a description he had, so Officer Tichy pulled the car over. Officer McWherter exited the vehicle, an-

nounced his office, and told the defendant to stop. At that point, the defendant looked at McWherter and began running eastbound. The officer told him to stop several times, but he kept on running. Officer McWherter pursued the defendant until the defendant ran into the front of the vehicle of another officer who had just pulled up. The defendant was then handcuffed and searched. Officer McWherter testified that the defendant was wearing a black sports jacket that looked like People's Exhibit No. 5. He identified People's Exhibit No. 6 as the photograph of the defendant, which depicted how the defendant looked on the day he was arrested.

On cross-examination, the officer testified that the defendant did not have a weapon on him when he was arrested nor did the defendant have credit cards, a checkbook, or a purse belonging to the victim.

Detective Bruce Larson testified that he had received training as a police sketch artist. He spoke with the victim on the day of the robbery and arranged to meet with her the next morning. She came to his department the next day and said she could complete a composite sketch of the robber's face. He asked her to describe the suspect's eyebrows. She said the eyebrows were average, so he drew generic eyebrows. She ran through a catalog that contained at least five pages devoted to each facial feature. From the catalog, she picked out the face shape, the nose, the eyes, and the mouth. Detective Larson drew the sketch with a pencil and showed it to the victim when he finished. She did not say that the eyebrows should be changed, and she did not provide any suggestion to make the sketch look more like the suspect.

Detective Larson went on to testify that on January 29, 2001, he met with the victim once more. At this time, he showed her two photographic lineups. He testified that the victim could not identify anyone from the first lineup but she did identify the defendant from the second lineup. He indicated that People's Exhibit No. 4 was the photographic lineup from which the victim identified the defendant as the suspect. She circled the number of the picture she recognized and put her initials next to the circled number.

After the State rested, the court allowed the State's motion to dismiss count II of the first superseding bill of indictment (aggravated robbery).

The defense evidence consisted of a stipulation entered into by the parties. The stipulation indicated that, if Therese Hussar were called to testify, she would state that she is an official court reporter assigned to Will County courthouse. On July 23, 2001, Ms. Hussar was assigned to courtroom 407 of the Will County courthouse. On that day, the case of *People v. Kerwin Doss* was called by the judge. When the case was called, the victim approached the podium. Kerwin Doss was also present in courtroom 407 when the case was called.

In rebuttal for the State, the victim testified that during her previous testimony in the State's case in chief, she had stated that she had never been in court at the same time as the defendant. She recalled being in the courtroom on July 23, but she did not recall seeing the defendant in court that day. From where she stood in the courtroom, she avoided looking to her right because she saw handcuffed men over there and did not want to make eye contact with anybody.

On cross-examination, she stated that she had forgotten about being in court on July 23, 2001. On that day, she remembered she was sitting outside when the case was called. When she was outside, she saw people in handcuffs in the jury box but did not look at "faces or anything."

After listening to closing arguments and retiring to deliberate, the jury found the defendant guilty of armed robbery.

The defendant's cause proceeded to sentencing on November 19, 2001. Prior to sentencing the defendant, the trial court heard and denied the defendant's motion for a new trial. The court then went on to sentence the defendant to a term of 12 years of imprisonment.

On December 5, 2001, the defendant filed a motion to reduce sentence. That motion was heard and denied on January 3, 2002. Defendant appeals.

## II. ANALYSIS

Defendant raises three issues on appeal. First, he contends that he was denied his right to a speedy trial. He also posits that the State failed to prove him guilty beyond a reasonable doubt. Finally, he claims it was an abuse of the trial court's discretion to require him to remain shackled during the trial.

### A. Defendant's Speedy Trial Claim

■ Section 103—5(a) of the Code of Criminal Procedure of 1963 (Code) states:

"Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant." 725 ILCS 5/103—5(a) (West 2000).

On February 15, 2001, the defendant was charged by indictment with armed robbery. The indictment accused the defendant of committing this armed robbery with a "toy pistol." The defendant was taken into custody on March 2, 2001. A first superceding bill of indictment was filed on July 12, 2001, charging the defendant with armed robbery with a "pistol." The word "toy" had been removed. Defendant ultimately proceeded to trial on September 13, 2001, which was 165 days after his arrest.

During the course of his confinement, 71 days of delay were attributable to the defendant. Defendant contends that because the State filed a first superceding bill of indictment upon which he was ultimately tried, the State does not get the benefit of these 71 days of delay attributable to him for speedy trial purposes. As such, he claims he was tried more than 120 days from the date taken into custody and his conviction should therefore be vacated and the charge against him dismissed.

"Where new and additional charges arise from the same facts as did the original charges and the State had knowledge of these facts at the commencement of the prosecution, the time within which trial is to begin on the new and additional charges is subject to the same statutory limitation that is applied to the original charges. Continuances obtained in connection with the trial of the original charges cannot be attributed to defendants with respect to the new and additional charges because these new and additional charges were not before the court when those continuances were obtained." *People v. Williams*, 94 Ill. App. 3d 241, 248-49, 418 N.E.2d 840, 846 (1981).

■ The parties agree that if the first superceding bill of indictment merely cured a "formal" defect in the original indictment, then speedy trial provisions are not implicated and the 71 days of delay attributable to the defendant apply to the second indictment. See *People v. Milton*, 309 Ill. App. 3d 863, 723 N.E.2d 798 (1999). However, if the second indictment contained substantive changes that altered the nature and elements of the offense charged, then the new indictment is subject to the same speedy trial limitations applicable to the original indictment. *Milton*, 309 Ill. App. 3d at 866. An amendment is substantive if it materially alters the charge and it cannot be determined whether the grand jury intended the alteration. *Milton*, 309 Ill. App. 3d at 866. See *People v. Flores*, 250 Ill. App. 3d 399, 62 N.E.2d 142 (1993). When applying this reasoning to the case at bar, we conclude that the amendment of the indictment from "toy pistol" to "pistol" was not substantive. The indictment signed by the grand jury accused the defendant of taking the victim's property while armed with "a dangerous weapon, a toy pistol," in violation of section 18—2(a) of the Criminal Code of 1961. 720 ILCS 5/18—2(a) (West 2000). Toy guns can be dangerous weapons under this section. See *People v. Skelton*, 83 Ill. 2d 58, 414 N.E.2d 455 (1980); *People v. Bayless*, 99 Ill. App. 3d 532, 425 N.E.2d 1192 (1981).

The State needed to put forth evidence that the defendant was armed with a dangerous weapon in order to convict the defendant of violating section 18—2. Changing the exact dangerous weapon listed in the original indictment does not alter the nature of the offense.

Furthermore, the State did not add a new or additional charge merely by amending the exact dangerous weapon used during the armed robbery. In the original indictment the defendant was charged with armed robbery. In the first superceding bill of indictment, the defendant was charged with armed robbery. Clearly, the nature of the offense stayed the same and no new or additional charges were added by the superceding bill of indictment.

We agree with defense counsel that such a change can alter the defense theory, but it does not change the elements of the crime or the nature of the offense. A change in an indictment from a black pistol to a chrome pistol might also alter defense theory somewhat if a victim was on record as stating she had seen one or the other. However, such a change would clearly be formalistic and would not add a new or additional charge. Therefore, speedy trial considerations would not be implicated.

Defendant believes the trial court's denial of the State's oral motion to amend the indictment and strike the word "toy" made pursuant to section 111—5 of the Code of Criminal Procedure of 1963 (725 ILCS 5/111—5 (West 2000)) evinces a finding by the trial court that the amendment was substantive and not formal. We disagree. The trial court made no specific finding as to whether it believed such an amendment was substantive or formal.

The trial court noted during the oral motion that the defendant "prepared this case envisioning that you would be presenting this as a toy gun case." On the day of trial, the court went on to state that it was "too late" to make such an amendment "at this late date." The court then remarked that if the State was within speedy trial demands, it could reindict the defendant. That is exactly what the State did. The defendant cites no authority, and we could find none, that holds a denial of a motion under section 111—5 is an automatic finding that the change sought by the State is substantive.

We hold the defendant was not denied his right to a speedy trial. The change in the indictment was merely formalistic and did not alter the nature of the offense charged.

## B. Reasonable Doubt

■ Defendant avers that the evidence introduced at trial was insufficient to prove him guilty beyond a reasonable doubt. When considering such a claim, it is not our function to retry the defendant but, rather, to examine the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *People v. McDonald*, 168 Ill. 2d 420, 660 N.E.2d 832 (1995).

The victim testified at trial and identified the defendant as the one who robbed her. She testified that she looked at the defendant "just enough" before he turned her head away with the weapon. On cross-examination, when asked if this "brief look" lasted "a couple of seconds," she responded affirmatively. She stated she was 100% certain that the defendant was the one who robbed her.

■ A single witness's identification of a defendant is sufficient to sustain a conviction if the witness viewed the defendant under circumstances permitting a positive identification. *People v. Lewis*, 165 Ill. 2d 305, 651 N.E.2d 72 (1995), citing *People v. Slim*, 127 Ill. 2d 302, 537 N.E.2d 317 (1989). While it was dark outside during the attack, a properly working streetlight was located at the scene. Moreover, the victim stated when she arrived home the night of the attack, she saw a man who was approximately 15 feet away running in her direction. She said hello to the man. This was the same man who put a gun to her head.

We find the circumstances under which the victim viewed her assailant were sufficient to permit a positive identification, even considering the discrepancies between the composite sketch and defendant's appearance. When examining the evidence in the light most favorable to the prosecution, we hold that a rational trier of fact could find the essential elements of armed robbery.

## C. Shackling of Defendant

Defendant next contends that it was an abuse of the court's discretion to force him to remain in leg shackles during his trial, and that he is, therefore, entitled to a new trial. We agree.

■ We review the circuit court's decision to keep the defendant shackled during trial under an abuse of discretion standard. *People v. Boose*, 66 Ill. 2d 261, 267, 362 N.E.2d 303, 306 (1977).

The State argues the defendant waived this issue as he did not object at trial to being shackled. Defendant asks us to review this matter under the plain error doctrine.

■ A reviewing court will review an issue under the plain error doctrine if the evidence is closely balanced or if the alleged error was so serious that it deprived the defendant of a fair trial. *People v. Black-well*, 164 Ill. 2d 67, 646 N.E.2d 610 (1995). Therefore, we must determine whether the judge's refusal to remove defendant's shackles deprived him of a fair trial and was therefore plain error.

■ The presumption of innocence is central to our administration of justice. *In re Staley*, 67 Ill. 2d 33, 364 N.E.2d 72 (1977). In the absence of exceptional circumstances, an accused has the right to stand trial with the appearance, dignity and self-respect of an innocent and free person. *Staley*, 67 Ill. 2d at 37.

In *People v. Boose*, 66 Ill. 2d 261, 362 N.E.2d 303 (1977), our supreme court stated that shackling should be avoided, if possible, because "(1) it tends to prejudice the jury against the accused; (2) it restricts his ability to assist his counsel during trial; and (3) it offends the dignity of the judicial process." *Boose*, 66 Ill. 2d at 265. When there is reason to believe a defendant may try to escape, may pose a threat to the safety of people in the courtroom or when it is necessary to maintain order during trial, shackling is allowed. *Boose*, 66 Ill. 2d at 265-66.

The *Boose* court went on to state:

"The trial judge should state for the record his reasons for allowing the defendant to remain shackled, and he should give the defendant's attorney an opportunity to present reasons why the defendant should not be shackled. These proceedings should take place outside the presence of the jury." *Boose*, 66 Ill. 2d at 266.

■ We hold the judge's refusal to remove defendant's shackles was plain error as it deprived him of a fair trial. A mere statement on the record that the judge believed the jurors could not see the shackles, as their view was obstructed by a table, is insufficient under *Boose*. The defendant had a right to a presumption of innocence and to stand trial with the appearance of an innocent and free person. While always of paramount importance, this right becomes even more significant in cases such as this where the defense theory is one of mistaken or inaccurate identity.

We therefore find that it was an abuse of discretion for the trial court to keep the defendant in shackles during the trial without stating on the record compelling reasons for so doing.

## CONCLUSION

For the foregoing reasons, the judgment of conviction is reversed and this cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

LYTTON and O'BRIEN, JJ., concur.