NOTICE

Decision filed 12/27/07. The text of
this decision may be changed or
corrected prior to the filing of a
Petition for Rehearing or the
disposition of the same.

NO. 5-05-0511

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellee, | ) Christian County. |
| | ) |
| v. | ) No. 03-CF-20 |
| | ) |
| KYLE W. BEATY, | ) Honorable |
| | ) Ronald D. Spears, |
| Defendant-Appellant. | ) Judge, presiding. |

_____

PRESIDING JUSTICE STEWART delivered the opinion of the court:

Following a jury trial in the circuit court of Christian County, the defendant, Kyle W. Beaty, was found guilty of four counts of aggravated criminal sexual assault (720 ILCS 5/12-14(a)(2) (West 2002)) and four counts of criminal sexual assault (720 ILCS 5/12-13(a)(1) (West 2002)), arising out of an alleged January 27, 2003, sexual assault on his ex-wife, Paulette Drone (Paula), and was sentenced to a mandatory natural-life sentence on each count. The defendant raises numerous arguments on appeal. We affirm.

BACKGROUND

The State moved to admit the defendant's prior criminal record as substantive evidence. Specifically, the State sought to introduce evidence, pursuant to section 115-7.3(b) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3(b) (West 2004)), regarding the defendant's 1998 conviction for the aggravated criminal sexual assault of Paula. The State also sought to introduce evidence regarding the defendant's 1997 conviction for the aggravated battery of Paula to show that Paula knew what he meant when he gave her the choice between physical abuse or sexual abuse. The trial court granted the motion.

1

At the trial, Paula testified that she and the defendant met in April of 1989 and married on June 21, 1990. She testified that their relationship was fine initially but that, within six months, he started verbally abusing her and eventually started physically and sexually abusing her. She testified that they had two sons together, Brendan and Michael Beaty.

Paula testified that, in 1996, she asked the defendant for a divorce and that he hit her and almost broke her cheekbone. She testified that she tried to run out the back door with the boys but that he caught her and broke her nose. She testified that, as a result of that incident, he was prosecuted and convicted and that he threatened to kill her if she ever brought charges against him again. She testified that she went back to him after the incident because he told her that he was sorry, that he loved her, and that it would never happen again.

Paula testified that on the evening of April 28, 1998, the defendant wanted to have sex with her before she went to work but that she did not consent. She testified that he grabbed her by her hair, dragged her into the bedroom, got her on the bed, put towels under her, rubbed Vaseline on her vagina, and repeatedly put his fist in her vagina all the way up to his wrist. She testified that she screamed and asked him to stop but that he hit her and told her that if she did not shut up, he was going to "do it longer." She testified that he put a washcloth in her mouth to keep her from crying out and that he held her down with one arm and sexually abused her for about 30 minutes. She testified that she sustained cuts and bruises and was bleeding. She testified that, as a result of this incident, he was prosecuted for aggravated criminal sexual assault. She testified that he continued calling and writing to her after his arrest, telling her that he was sorry, that he loved her, that he would change, and that it would never happen again. She testified that, although she was angry and did not want to speak to him, she felt guilty because of their boys and felt like she should give him a

2

chance.

Paula testified that in 1998 the defendant convinced her to stop cooperating with the State and to write out a statement that she had lied about the incident. She identified People's Exhibit 1 as the statement she prepared and signed before a notary on June 15, 1998. The statement, which was admitted into evidence and read to the jury, provides as follows:

"To whom it may concern:

I want to tell everyone that I lied on my police statement. I consented to have sex with Kyle the night of April 28th. I agreed to do all of it. I only said I didn't because I wanted to divorce Kyle but was too afraid to ask him since I had him arrested for aggravted [*sic*] battery. I never realized he could receive such a long term. I can't let him go to prison for something he didn't do. He is still my husband and I won't testify against him. I am sorry for lying but I was scared to just ask for a divorce!"

She testified that the statement was false, that he had sexually assaulted her in 1998, and that she had been physically injured as a result. She testified that he pleaded guilty to the aggravated-criminal-sexual-assault charge even after she had written the false recantation.

Paula testified that her relationship with the defendant continued after he was in prison for the 1998 assault. She testified that he continued to call her and write letters to her, that she wanted to try to make their marriage work because she thought he would change, that she took the boys to visit him in prison, and that he promised he would change.

Paula testified that the defendant was paroled after two years, that she agreed to go to his mother's house so he could see the boys, and that they resumed a romantic relationship. She testified that he was returned to prison a short time later for violating his parole and that she continued to have contact with him through letters, phone calls, and visits with the boys.

Paula testified that at some point while the defendant was still in prison, she divorced

him and married Dustin Drone in November of 2002. She testified that their relationship was fine at first but that he, too, had become physically abusive toward her.

Paula testified that after the defendant was released from prison in January of 2003, he asked to visit the boys and that she took them to his mother's house for a weekend. Dustin was with her when she picked them up from the visit. On the way home, she and Dustin got into an argument, and he was physically abusive toward her. After she took him home, she and the boys left in the car. She called the police, and Dustin was arrested.

Paula testified that on the following day when she told the defendant what had happened, he asked her to come back to his mother's house. She took the boys out of school for a week and took them with her so they could spend time with the defendant. She testified that the first few nights they all slept in the living room. She testified that she was leery of getting back together with him but that he told her that she did not need to be afraid of him, that he was not mad at her, and that it would be okay. She testified that after a few days, she believed him and wanted to keep their family together, so they resumed a consensual sexual relationship. She testified that for the first few days, their relationship was normal but that after a couple of days, he asked if he could do abnormal things to her. She refused. She testified that he tried to persuade her for quite a while but eventually gave up.

Paula testified that on January 27, 2003, after they took the boys to school, they stopped and got some beer and returned home. She testified that after he drank about eight or nine beers, he got mad at her for having him locked up for five years and told her she had taken five years of his life. She testified that he grabbed her by her hair, dragged her to the bedroom, and told her to sit down and shut up. She testified that she did as she was told because she was afraid, that he calmed down, and that they went back into the kitchen.

Paula testified that he got mad again, and she described what he said: "He said he was going to beat the shit out of me." Paula testified that he grabbed her by her hair, dragged her

4

to the bedroom, shoved her on the bed, took off her shirt, and told her to take off the rest of her clothes. She testified that she did as she was told because she was afraid, that he punched her in the stomach so hard that it knocked the wind out of her, that he started having sex with her against her will, and that she was very scared. She testified that she was lying on her back, that he was holding her arms down, and that he stopped, slapped her across the face, and "asked [her] if [she] would rather have the shit beat out of [her] or take the sexual stuff." She testified that she knew what physical abuse and sexual abuse meant and that, given the choice, she chose sexual abuse. She testified that she was afraid because her nose had already been broken three times, and she had been told that it could kill her if it was broken again. She testified that he then put one or two fingers in her urethra, stuck his penis in her anus, put his fingers in her anus, and then alternated between her urethra and her anus until she was finally able to talk him into letting her up. She testified that she did not consent to any of these things, that she told him to stop, and that he finally stopped after she told him she had some doctors' appointments she needed to keep.

Paula testified that she went to a 1:30 p.m. appointment with Dr. Chen but that the defendant accompanied her and was in the room with her while she saw Dr. Chen. She testified that she was angry with him while they were at Dr. Chen's office, and she denied that she was affectionate toward him in Dr. Chen's office that day. She testified that she was afraid of him and that she did not tell Dr. Chen about the incident.

Paula testified that after her appointment with Dr. Chen, she had an appointment for a mammogram at the hospital. She testified that the defendant had been complaining of chest pains and waited in the car when she went into the hospital. She acknowledged that she did not tell anyone in the hospital about the incident and that, after she had been inside for a while, she went out to the car to see if the defendant needed help because she was worried that he might have a heart attack. She testified that he came back into the hospital with her.

5

Paula testified that after her mammogram, she and the defendant stopped at Casey's General Store to get a drink. She testified that he had gotten angry because she had refused to talk to him because of what had happened and that he had gotten out of the car and started walking down the highway. She testified that she went after him because he was more dangerous when she did not know where he was than when she did. She explained that she figured she could talk to him and calm him down but that after she had followed him a couple of blocks, she turned around.

Paula then went to get the boys from her father's house. She testified that she did not tell her father what had happened because her family had already been through so much because of the defendant and she did not want them to know what had happened.

Paula testified that she then went home. She testified that the defendant called her several times from his mother's house but that she did not answer the phone.

Paula testified that she then went to her brother's house and that, at that time, it finally hit her what had happened. Her brother, Jeff Tipsword, and her sister-in-law, Michelle Tipsword, were at home. She told Michelle that the defendant had hurt her again and that she might as well kill herself because otherwise she would just be living in fear. She testified that her stepsister, Jodi Hill, came to her brother's house later.

Paula testified that, at some point, she, Michelle, and Jodi left to go to the sheriff's office to press charges. She stated that she did not want the defendant to know she was going to the sheriff's office, so she called him and told him that she and Jodi were going shopping. He told her that he was sorry and that he was angry at the time. She testified that he responded affirmatively when she asked him, "Did you or did you not lit [*sic*] me?" She also testified that he responded affirmatively when she asked him, "And did you or did you not give me a choice between gettin' the crap beat out of me or sexual abuse?" She testified that she eventually hung up on him after he repeatedly tried to get her to come and talk to

6

him.

Paula testified that after they got to the sheriff's office and she told a deputy what had happened, they went to St. Vincent Memorial Hospital in Taylorville for an examination. She testified that she told the nurse what had happened and that the nurse had a form and asked her yes-or-no questions and recorded her responses. She testified that she responded affirmatively when asked whether the defendant had penetrated her vagina with his penis, her vagina with his fingers, her anus with his penis, and her anus with his fingers. She testified that Dr. Harvey also asked her a few questions and examined her. She denied telling him that there had been no anal intercourse during the incident. She testified that she subsequently met with Bob Patrick from the sheriff's office and told him what had happened.

Paula testified that during the five days before the defendant was arrested, she stayed with relatives, going to her house each day to get clothes but always taking someone with her. She testified that on the fifth day, the couch was further out from the wall than usual. She looked under the couch, and the defendant was hiding under there. She testified that he followed her outside and kept saying, "How could you do this to me *** and I'll go away for a long time." He left when she went to her brother's house to call the police. She testified that after he had been arrested, he called her and tried to get her to help him but that she refused.

Paula testified that she had a conversation with Jesse Demascal, the defendant's 14-year-old son by Diane Durbin. She testified that she told him that, because of the boys, she was having a hard time dealing with the fact that the defendant might be sent away for a long time. She asked him what he wanted her to do and how he felt about his father. She denied telling him or anyone else that she had made up the 2003 incident.

Michelle Tipsword testified that she had been married to Paula's brother, Jeff, for more than 20 years. She testified that she, Jeff, and their two children lived about a block

7

away from Paula and that on the afternoon of January 27, 2003, both Paula and her stepsister, Jodi, came to their house. She testified that Paula was upset and that she and Jodi took Paula home to get some clothes and to find a safe place to stay. She testified that Paula's caller identification indicated that seven or eight phone calls had been made from the defendant's mother's home and that the phone was still ringing when they were there.

Michelle testified that while they were on the way to the sheriff's office, Paula used Jodi's cell phone to call the defendant to tell him they were going shopping so he would quit calling her. She explained that she could hear what Paula and the defendant said because he was yelling at her and begging her to come talk to him about what had happened. She testified that when Paula asked him whether he had given her a choice between physical abuse and sexual abuse that day, he responded, "Yes, but you made me mad." She testified that when Paula asked him whether he had hit her three times that day, he responded, "Yes, but I was pissed." She testified that he continued to ask Paula to come talk to him but that Paula refused and told him that he had hurt her and that she did not love him anymore.

Jodi Hill testified that when she arrived at Michelle's house on January 27, 2003, Paula was already there and was very upset. Jodi testified that she, Michelle, and Paula went to Paula's house to get some things and that while they were there, she noticed that several calls had been placed to Paula's house from the defendant's mother's house. She testified that the phone continued to ring while they were there but that no one answered it.

Jodi testified that while they were on the way to the sheriff's office, Paula used her cell phone to call the defendant. She testified that she could hear both sides of the conversation because Paula was leaning over toward her with the phone between them. She testified that he asked Paula to come over so they could talk but that Paula refused. She testified that when Paula asked him if he had given her a choice between physical abuse and sexual abuse, he responded that he had because he was mad. She testified that when Paula

8

asked him if he had struck her three times that day, he responded that he had because she had "pissed [him] off." She testified that he continued to beg Paula to come over so they could talk but that Paula kept refusing, told him they were going shopping, and ended the phone call shortly thereafter.

Dr. Leslie Jackson testified that she is board certified in family medicine and that she had been Paula's doctor for 10 or 15 years. Dr. Jackson testified that when she treated Paula for a broken nose in 1996, Paula told her that her husband had hit her. Dr. Jackson also testified that during the time she had treated Paula, Paula had told her of other instances of abuse at the hands of the defendant.

Dr. Jackson testified that in April of 1998, someone from St. Vincent Memorial Hospital's emergency room called to tell her that Paula was there for an evaluation for sexual assault and to ask if she wanted to see Paula or if she wanted the emergency room doctor to see her. Knowing what had happened to Paula in the past, Dr. Jackson decided to see Paula herself. Dr. Jackson testified that she examined Paula and found that she had sustained physical injuries as a result of the sexual assault.

Dr. Jackson testified that in March of 2005, she evaluated Paula and concluded that Paula suffered from posttraumatic stress disorder caused by battered woman's syndrome. She explained that someone suffering from battered woman's syndrome stays in an abusive relationship either because she does not have the self-esteem or the ability to leave or because she is afraid that the abuser will kill her if she tries to leave. She testified that someone with battered woman's syndrome might be very reluctant to report abuse, might delay reporting abuse, might be hesitant about following through with a criminal prosecution of the abuser, might consult with others about whether or not to proceed with the prosecution, and might recant her allegations of abuse.

When asked on cross-examination if she had diagnosed Paula with battered woman's

9

syndrome in 1996, Dr. Jackson testified that although she did not write the diagnosis on Paula's chart, she did make the diagnosis and she treated Paula accordingly. She testified that although she did not document the diagnosis, Paula obviously suffered from it and they discussed the appropriate treatment. She testified that she encouraged Paula to end the relationship, to get therapy, and to go to the battered women's shelter with the boys.

Jeffrey Brown, a deputy sheriff, testified that on January 28, 2003, he and some other officers went to the defendant's mother's house looking for him. His brother, Rodney Beaty, was there and let them into the house. While they were there, Rodney played messages that were on the answering machine. Brown testified that he had met the defendant before and that he recognized one of the voices on the answering machine as the defendant's. Brown testified that, in that message, the defendant said, "Mom, if the police come looking for me[,] tell them I was with you last night and I went to Public Aid to sign up for Public Aid." Brown testified that Rodney erased the message after playing it.

Robert Patrick, an investigator with the sheriff's office, testified about a conversation he had with the defendant on the evening of January 30, 2003. Patrick testified that the Pana police department had arrested the defendant and that he met the defendant there. Patrick testified that the defendant initially agreed to speak to him but, once he received a copy of his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)), he decided to wait for an attorney, so Patrick did not interview him. Patrick testified that he put the defendant in the squad car, headed to Taylorville, and asked the defendant how his mom was doing. Defense counsel objected, arguing that the defendant had requested an attorney before Patrick initiated the conversation. Over defense counsel's objection, Patrick testified that the defendant laughed and said, "Why didn't you guys look under the couch?" Patrick testified that the defendant also said, "I heard everything you guys said," "I don't know why she did this," "She just got mad because I was going to take the

10

boys to Arena Cross[,] *** a motorcycle event in Springfield," and "I know the money's tight, but I told her we could skip a bill so I could take the boys up there." On cross-examination, Patrick testified that Paula told him that the defendant had taken $200 from her.

Valerie Ellinger Koches testified that on the evening of January 27, 2003, she worked as a registered nurse in the emergency department at St. Vincent Memorial Hospital. She testified that shortly before 7 o'clock that evening, Paula came in and said that she had been assaulted. Koches testified that Paula told her that the defendant grabbed her by the head, took her into the bedroom, made her sit down, threatened to beat her if she said a word, took off her shirt, got her undressed, gave her a choice of either physical abuse or sexual abuse, slapped her across the face, punched her in the stomach twice, stuck his fingers up her urethra, and put his penis in her. Koches testified that Paula told her the defendant let her go after she had reminded him that she had a doctor's appointment but that he went with her to the appointment. Koches testified that she went through a questionnaire typically used in sexual assault cases, asking Paula a series of questions and recording her answers, and that Paula indicated that the defendant had penetrated her vagina and rectum with his penis and finger.

On cross-examination, Koches testified that Dr. Harvey did an assessment on Paula and that she was present during the assessment. Koches did not recall Paula telling Dr. Harvey that she had brief vaginal intercourse with the defendant, that she had been having unprotected sexual intercourse with him for the previous two weeks, or that she had denied having anal intercourse. Koches acknowledged that she had noted that there were no bruises or abrasions and that Dr. Harvey had noted that there was no evidence of physical trauma. On redirect examination, Koches testified that the fact that there was no evidence of physical trauma was not unusual in a case where someone had been assaulted but had not resisted.

Dr. David Harvey, an emergency room physician at St. Vincent Memorial Hospital,

testified that he was working at approximately 7 p.m. on January 27, 2003, when Paula came to the emergency room complaining that she had been sexually assaulted. Dr. Harvey testified that Paula told the nurse that the defendant grabbed her by the hair, took her into the bedroom, made her sit down, threatened to beat her up if she said anything, took off her shirt, told her to get undressed, gave her a choice between physical abuse or sexual abuse, slapped her across the face, punched her in the stomach twice, stuck his fingers up her urethra, and penetrated her vagina and anus with his penis and fingers but did not ejaculate. Dr. Harvey testified that Paula also told the nurse that the defendant stopped after she told him she had a doctor's appointment and that he went with her to the appointment. Dr. Harvey did not find any evidence of physical injury, which he testified was not uncommon where the victim had not resisted the assault.

Jarrod Clark testified that on January 31, 2003, he was in jail in Christian County on charges of possession of methamphetamine-manufacturing materials and burglary. Clark identified the defendant and testified that while he and the defendant were both housed in the bullpen area, the defendant had discussed what he had done to Paula. Clark testified that what the defendant said bothered him because he thought it was morally wrong to do something like that against a person's will. Clark testified that, a couple of days later, he spoke with a deputy, who asked him to prepare a written statement of what the defendant had said. He read the written statement to the jury as follows:

"Kyle Beaty on January 31st described explicitly what he did to his ex-wife Paula on Monday, January 27. He said he fingered her in the cunt[,] then fucked her in the cunt, jerked off [on] her[,] and then rubbed juice on her asshole[,] and then he fingered her in it and then fucked her in the ass and said he gave her what she deserved. Both Luke Dunaway and I were present at the time [he] described the rape. He has repeatedly called and asked [his] mother and niece to get in contact with his

12

ex-wife to talk to her and tried to call her at Kroger to see if he could get through to her there, too."

Donna Castelli, the circuit clerk of Christian County, identified certified copies of the records of conviction for aggravated battery in case number 96-CF-213, People v. Kyle Beaty, and for aggravated criminal sexual assault in case number 98-CF-108, People v. Kyle Beaty. Both exhibits were admitted into evidence.

The parties stipulated that if Paula had been asked to identify her attacker, she would have identified the defendant. The State then rested. The defense moved for a directed verdict, which the trial court denied.

The defense called Luke Dunaway, who testified that he was at that time serving a prison sentence for aggravated battery of a child. Dunaway read his handwritten statement to the jury as follows:

"I was in the cell with Kyle Beaty and [Jarrod] Clark. I heard everything that was said and I know for a fact that Kyle never gave a statement or confession of any type to any inmate. ***

\* \* \*

*** [I]t came to my attention that [Jarrod] Clark made such a statement and put my name on it. I asked the investigators that took the statement to take my name off of Clark's written statement because I knew it wasn't true and *** I wanted no part of it. The only thing that Kyle ever talked about was how he was set up and that his girlfriend lied."

Defense counsel then asked: "Mr. Dunaway, did you give any other statements? Wasn't there some other statement you made at some point?" Dunaway replied, "Not that I'm aware of."

On cross-examination, Dunaway acknowledged that on February 14, 2003, he had

13

spoken with Patrick and Brown, but he testified that he did not recall telling them that the defendant had told him that he had raped his ex-wife, that he had vaginal and anal sex with her, and that he had masturbated on her and placed his fingers inside her. Dunaway testified that he had written his statement approximately four months after speaking with the officers, but he could not recall whether anyone had asked him to write the statement. On redirect examination, Dunaway testified that he was telling the truth on the witness stand. On recross-examination, when he was asked whether he was telling the truth when he spoke to the officers on February 14, 2003, Dunaway responded, "I don't remember February 14[,] 2003."

Dustin Drone testified that he was serving a prison sentence on a domestic charge unrelated to Paula, that he was a sex offender, and that he had a felony conviction for unlawful restraint. He testified that he and Paula were married in August or September of 2002 and that during an argument in January of 2003, he poked her in the leg, hit her windshield with his fist, and broke the windshield. He testified that he was arrested for battery and that she bonded him out. He testified that during an argument in late January or early February of 2003, he poked her in the leg or arm; that they made up that night; that she had him endorse a tax refund check; and that when he went to pick her up from work the following day, she had him arrested. He testified that her reputation for truthfulness was "[n]ot very good." On cross-examination, he acknowledged that he was serving a sentence for domestic battery involving bodily harm; that, in April of 2003, he was convicted of felony unlawful restraint; that, in November of 1995, he was convicted of aggravated criminal sexual assault on a victim under the age of nine; that, in 2003, he pleaded guilty to two domestic battery charges in which Paula was the victim; and that she had divorced him after the second incident.

Sheryl Rhoades, the defendant's mother, testified that when the defendant was

14

released from prison the last time, he spent the first night, a Friday, at her house. She testified that the boys were brought over the next day, that they stayed the weekend, and that Paula's father picked them up on Sunday morning. She testified that the following day Paula came over and hid her car in the garage, that Paula was there off and on that week, and that Paula and the defendant were getting along very well. She testified that she went into the hospital with pneumonia the following Monday, January 27; that she was in the hospital for a week; and that she did not know what happened while she was in the hospital.

Jesse Demascal testified that, in 2003, Paula told him she knew how to keep his dad in prison. He testified that she asked him what he thought about his dad getting a long prison sentence and that he told her he would like to see his dad out of prison.

Diana Beaty, the defendant's sister-in-law, testified that in April of 2002, she had a phone conversation with Michelle in which Michelle said that Paula was upset because the defendant would soon be released from prison. She testified that Michelle said, "No matter what, we will have him put back in," and that she would "even lie on the witness stand."

Mark Ford, a private investigator for the defendant, testified that when he interviewed Paula, she said that she liked rough sex with the defendant and that she had given him the hickeys that were on his neck when he was arrested. On cross-examination, Ford acknowledged that Paula told him that the defendant liked to do certain "sick" things to her and that "[s]he could have" said something to the effect that he had forced those things on her.

The defendant testified that he was 42 years old and that he was serving a prison sentence. He testified that he and Paula met on April 28, 1989, and were married in 1990.

As to the 1996 battery of Paula, the defendant testified that he came home drunk, that she was mad at him for being out so late and was getting up in his face, that he told her to quit but she would not back off, that he smacked the closet door, that she went outside, that

15

he followed her outside and tried to calm her down and to hold her, that her nose started bleeding, and that she charged him with battery. When asked if he hit her in the nose, he responded: "No, I did not. Not that I recollect. Not that I remember whatsoever."

The defendant testified that he was on parole at the time and that he was arrested and sent back to prison. He testified that when Paula came to visit him a couple of days later and told him her nose was broken, he asked her what was going on because he had not hit her and she said she did not know what had happened. He testified that he pleaded guilty to the battery because the State offered him a plea bargain. He testified that there was an altercation, that he did not know what had happened, and that her nose was broken during the altercation.

The defendant testified that Paula visited him every week during the nine months he was in prison on the battery charge and that she sometimes brought the boys with her. He testified that after he was released from prison on the battery charge, he was out for about 8½ months and that the two of them got along well during that time.

As to the 1998 aggravated-criminal-sexual-assault charge, the defendant testified that he and Paula had "[k]inky rough sex" before she went to work and that "she didn't complain whatsoever." He testified that he pleaded guilty because Paula asked him to do so for her and the boys, that he was sentenced to six years' imprisonment, that he served three years, and that Paula and the boys came to visit him about once a week while he was in prison.

The defendant testified that he was paroled for about 13 days in 2001. He testified that he and Paula were together all the time during those 13 days and that when his parole officer found out, he was sent back to prison for another year and 10 months for violating his parole.

The defendant testified that when he first went back to prison, Paula did not visit him because of the order of protection but that she started visiting him again in June of 2002. He

16

testified that they got along fine and were planning to remarry but that, in early October of 2002, she quit visiting him. He testified that he called her and that she told him she had met Dustin. He testified that Paula and Dustin were married in November but that he was still friends with her and continued to call her even though she was married. He testified that when he called her, she would cry because Dustin was upsetting her and that he told her to get away from Dustin and that when he got out of prison, he would take care of everything. He denied that he had a temper or that he was violent.

The defendant testified that he was released from prison on a Friday in January of 2003, that he called Paula when he got home to ask if he could see the boys over the weekend, that Dustin was in the background objecting, and that Paula said she would call him back the next day. He testified that she called him on Saturday morning and said that she would bring the boys to his house at 6 o'clock that evening. He testified that Paula and Dustin dropped the boys off later that evening and picked them up at noon on Sunday.

The defendant testified that Paula called him later that evening, told him that Dustin had been arrested, and asked him if he would like to spend the following day with her and the boys. They picked him up the following morning, went to the laundromat to wash clothes, and talked about getting back together. He testified that she asked him if he would like to go in the bathroom to have sex, that he declined and told her there was a better time and place, and that she wanted to do it later. After the clothes were done, they went to his mother's house to spend the night. He testified that they had "straight vaginal" sex that night, that during the week she came to his mother's house every night, that they got along fine, that they had sex every night, and that they both enjoyed it.

The defendant testified that when Paula came home from work on Saturday evening, she was acting funny, like she was messing around on him. He testified that he said something like "it's over between us" or "let's just call it off." He testified that she got upset,

17

went into the bathroom, shut and locked the door, and yelled that she was going to commit suicide and that she had taken a handful of pills. He testified that when he finally convinced her to unlock the door and come out of the bathroom, she looked fine, and he did not believe she had taken any pills. They patched things up, and she laid down and went to sleep.

The defendant testified that on the day of the incident in question, he and Paula dropped the boys off at school at about 8:30 a.m. and arrived home at about 9 a.m.; that he told her that if she did not quit using drugs, he was going to leave her and take the boys; that they argued; that he told her it was over between them; that she asked him for $200 she had given him the previous Thursday for bills; that he gave her the $200; that they talked for a while, kissed, and made up; that he told her to give him the $200 back; and that she gave him the $200. He also testified that they went into the bedroom; that she sat on the end of the bed, unzipped his pants, and performed oral sex on him; that they had anal and vaginal intercourse; and that she gave him hickeys. He denied dragging her to the bedroom, forcing her in any way, pulling her hair, slapping her, or hitting her. He testified that the intercourse was consensual, that she did not tell him to stop, and that they both enjoyed it.

The defendant testified that they went to her doctor's appointment and that he went into the examining room with her. He testified that when she went into the hospital for her mammogram, he waited in the car because he was not feeling well and that after about 20 minutes, she came back out to the car and asked him to go inside with her, which he did.

The defendant testified that after Paula's mammogram, they went to Casey's General Store. He testified that while she was inside, he got out of the car and started walking down the road; that when she came out, she pulled the car up beside him, asked him what was wrong, and told him she loved him; that he told her it was over; that she asked him why and begged him to get in the car; that he continued walking and telling her it was over; and that she left.

18

The defendant testified that while he was hitching a ride to his mother's house, he was thinking that he loved Paula and the boys, that he wanted to be with them, and that he wanted to call her and make up. He tried to call her at home but could not reach her. He knew she had to go pick up the boys from school or from her father's house, so he called her father's house, but her father said that she was not there. He called her father's house a second time, and her father said that she had not been there. He then asked to speak to his son, who told him that Paula had left 10 or 15 minutes earlier. At that point, he knew that Paula's father had lied to him, and he asked to speak to Paula's father again. He asked Paula's father why he had lied, and Paula's father asked him why he had "smacked" Paula. He testified that, at that point, he realized that she was going to get him in trouble. He testified that he had been out of prison for only 13 days.

He testified that Paula called him, using Jodi's cell phone, and told him they were going shopping. He denied Jodi's and Michelle's statements regarding what was said during that conversation. He denied that Paula asked him if he had given her a choice between physical abuse and sexual abuse. Although he acknowledged that she did ask him why he had smacked her, he testified that he told her he did not know what she was talking about. He testified that he knew she was trying to set him up because she told him Jodi was right there.

The defendant testified that when he got home, the house was dark. He started calling people to try to find Paula. He called his brother, who told him that four or five police cars had pulled him over. He testified that, at that point, he knew Paula was trying to start something on him and that he was facing a life sentence. He did not want to be arrested, so he hid under the couch for about four days. During that time, Paula was in and out of the house several times. The police were also in and out of the house, searching the place.

The defendant testified that after about four days, someone asked why the couch was

pulled out so far from the wall. Paula looked under the couch, saw him, and started screaming. He asked her what she was doing to him. When she went to her brother's house to call the police, he fled to Pana, where he was arrested a short time later. He testified that when he was booked in Christian County, he had hickeys on his neck, Greg Sims and Guy Humbarger saw the hickeys, and he asked them to take pictures of the hickeys.

The defendant testified that while he was in jail in Christian County, he was moved to the bullpen, where Clark and Dunaway were housed. He testified that he was disgusted about the charges against him and that he threw his information papers on the table and said, "Look at this stuff." He testified that Clark read the papers, which is how he got the information about the charges, and that he did not know whether Dunaway read the papers. He testified that he told Clark that Paula was lying. He testified that the incident was consensual, that he did not assault her, that he was going to leave her because of her drug use, and that she was trying to get rid of him so he would not take the boys away from her.

On cross-examination, the defendant acknowledged that on January 2, 1997, he pleaded guilty to a 1996 aggravated battery charge against him alleging that he had caused Paula great bodily harm in that he struck her in the face with his fist, causing a broken nose and a black eye. He also acknowledged that he had been drinking, but he claimed that her nose had started bleeding mysteriously and that he had admitted to the false charge because he was given a plea bargain. He acknowledged that he had been verbally abusive toward Paula and that he had hit her, but he testified that he did not remember hitting her during the 1996 incident.

The defendant also acknowledged that on July 13, 1998, he pleaded guilty to an aggravated-criminal-sexual-assault charge against him alleging that on April 28, 1998, he placed his fist in Paula's vagina and caused her bodily harm. He also acknowledged that they had "rough kinky sex that night," but he testified that it was consensual and that she enjoyed

20

it. He testified that he pleaded guilty because she asked him to do so. He acknowledged that she had put him away for five years, but he denied that he was mad at her for doing so. He testified that he could not recall whether she was gagged during the 1998 incident. He testified that she enjoyed it when he stuck his whole fist in her vagina, but he could not recall whether she bled or urinated on herself when he did that. He denied putting a towel down beforehand because he knew that might happen, testifying that he put the towel down because she puts Vaseline on herself and he did not want to get Vaseline on the sheets, but he could not recall whether she put Vaseline on herself during the 1998 incident. When asked if he held her down with his left arm and used his right arm to penetrate her with his fist, he responded that he could not recall exactly what happened in 1998 because he was too focused on 2003.

The defendant testified that he did not recall telling Paula before he was paroled in January of 2003 that he had changed and that things would be better when he was released. He testified that he did tell her that when he was released he wanted to see the boys and that she had accommodated him, which had caused problems between her and Dustin. He testified that she had contacted him, saying that she wanted to get back together. He denied asking her to engage in sexual activities against her will.

The defendant testified that on the day of the incident in question, after taking the boys to school and before returning home, he and Paula stopped and got some beer. He testified that he drank two or three beers and that they had sex at approximately 12:30 p.m. He testified that he put his penis in her vagina, his fingers in her vagina, his penis in her anus, and his fingers in her anus. He denied that he became upset with her for sending him to prison for five years, that he pulled her into the bedroom by her hair, that he hit her, that he punched her in the stomach, that he gave her a choice between physical abuse or sexual abuse, that he held her down, that she told him to stop, that she told him no, or that he said

21

he gave her what she deserved. He testified that she told him that they had to finish up and get ready to go to her doctor's appointment. He testified that they went to the appointment together and made out in the examination room.

The defendant denied that the argument at Casey's General Store took place because Paula would not talk to him. He testified that they had gotten into an argument earlier in the day about her drug use and that she had commented that a little drug use was okay. He testified that while she was inside Casey's General Store, he remembered her statement, assumed she was going to keep on using drugs, decided to break up with her, got out of the car, and left. He acknowledged that he told Patrick that Paula was mad at him because he wanted to take the boys to Arena Cross and she did not want him to spend the money. He testified that he did not want to say anything to Patrick about Paula's drug use because he did not want to get her in trouble.

The defendant testified that Paula used Jodi's cell phone to call him the day of the incident to tell him that she and Jodi were going shopping. He testified that he got a ride to Rosamond looking for her because he figured she would be back any time and that they would get back together. He testified that he called her father's house trying to find her and that he called a relative, who told him the police were looking for him. He acknowledged that, instead of contacting the police and telling them he was innocent, he hid under the couch at Paula's house and that he called his mother and left a message, telling her that if the police came looking for him, she should tell them he was there with her "on some night," but he testified that his message had nothing to do with this case because the incident happened at noon. He denied telling Clark and Dunaway that he had assaulted Paula and that she had gotten what she deserved. He testified that Clark got the information from his information sheets.

On redirect examination, the defendant testified that he had gone into hiding because

22

he knew he was facing a mandatory life sentence based on his prior convictions. He testified that on the day of the 2003 incident, he had only three beers and was not drunk. He testified that Michelle and Jodi were Paula's best friends and that they disliked him.

On recross-examination, the defendant testified that even though he thought Paula was trying to get him in trouble for something he did not do, he would never do that to her because he loved her, which is why he did not tell Patrick about her drug use. After the defendant's testimony, the defense rested.

In rebuttal, Patrick testified that, on February 14, 2003, he interviewed Dunaway, at Dunaway's request. Deputy Brown was also present during the interview. Patrick testified that Dunaway said that when the defendant was put in a cellblock with him and Clark, he told them "that he had raped his ex-wife, that they had had vaginal and anal intercourse, that he had jacked off on her[,] and that he had inserted his fingers up in her." Patrick also testified that, on May 12, 2003, he sat in on an interview that Ford conducted with Paula. He testified that he did not recall Paula saying that she had given the defendant hickeys; that, immediately after the interview, he prepared a report of the interview, which included all the pertinent details of the interview; that when he prepared the report, he knew what the charges were and what the case was about; and that if Paula had said that she had given the defendant hickeys at about the time of this alleged assault, he would have put that in his report. He denied that Paula told Ford that she was into "kinky sex" or that these "weird sex acts" were consensual. He testified that when Ford asked her if this was a normal part of their intimacies, she responded that they were not, that the defendant had forced her to do those things, that he had put his finger up her urethra, and that "it hurt like hell." He testified that he had documented her statements in his report. On cross-examination, he testified that he was not aware that Dunaway had given a written statement in June of 2003.

In rebuttal, Paula testified that she had never smoked marijuana. She acknowledged

23

that Dustin used drugs when she was with him, that he kept drug paraphernalia in their home, that she told the defendant about this when they reconciled, that he was upset about it, and that he wanted to know if she had been using drugs, which she denied. She testified that he had often accused her of using drugs but that she had consistently denied it, that he did not tell her he was leaving Casey's General Store because he was mad at her for using drugs, and that a fight related to her drug use did not precipitate the assault on January 27, 2003. On cross-examination, she acknowledged that, while Dustin was in jail, she asked the defendant to take her to get rid of a "bong" that belonged to Dustin. After Paula's testimony, both the State and the defense rested.

The jury found the defendant guilty on all counts, and the trial court sentenced him to a mandatory natural-life sentence on each count. He filed a timely notice of appeal.

ANALYSIS

The defendant first argues that he was denied a fair trial by the State's use of other-crimes and propensity evidence against him to prove that he has a character defect that makes him the type of person likely to engage in rape, and the defendant argues that section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2004)), which authorizes the use of that evidence, is unconstitutional. Section 115-7.3 provides, in pertinent part, as follows:

"(a) This Section applies to criminal cases in which:

(1) the defendant is accused of predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual assault, aggravated criminal sexual abuse, criminal sexual abuse, or criminal transmission of HIV;

(2) the defendant is accused of battery or aggravated battery when the commission of the offense involves sexual penetration or sexual conduct ***; or

(3) the defendant is tried or retried for any of the offenses formerly

24

known as rape, deviate sexual assault, indecent liberties with a child, or aggravated indecent liberties with a child.

(b) If the defendant is accused of an offense set forth in paragraph (1) or (2) of subsection (a) or the defendant is tried or retried for any of the offenses set forth in paragraph (3) of subsection (a), evidence of the defendant's commission of another offense or offenses set forth in paragraph (1), (2), or (3) of subsection (a), or evidence to rebut that proof or an inference from that proof, *may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant.*

(c) In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:

(1) the proximity in time to the charged or predicate offense;

(2) the degree of factual similarity to the charged or predicate offense; or

(3) other relevant facts and circumstances." (Emphasis added.) 725 ILCS 5/115-7.3(a), (b), (c) (West 2004).

In *People v. Donoho*, 204 Ill. 2d 159, 788 N.E.2d 707 (2003), the Illinois Supreme Court examined the legislative history of section 115-7.3 and noted as follows:

"Senator Radogno specified that the statute is patterned after the Federal Rules of Evidence. The Federal Rules of Evidence also generally prohibit admission of other-crimes evidence to demonstrate propensity and allow its admission to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. [Citation.] Effective July 10, 1995, Congress enacted Federal Rules of Evidence 413 *** and 414 ***. [Citation.] These rules have been interpreted *** to permit the introduction of other-crimes evidence to show

25

defendant's propensity to commit sexual assault or child molestation. [Citations.] Therefore, Senator Radogno was explaining that section 115-7.3 is modeled after *** Rules 413 and 414, which allow admission of other-crimes evidence to establish defendant's propensity to commit sex offenses." *Donoho*, 204 Ill. 2d at 174-75, 788 N.E.2d at 717.

The *Donoho* court found, "[T]he legislature enacted section 115-7.3 to enable courts to admit evidence of other crimes to show defendant's propensity to commit sex offenses if the requirements of section 115-7.3 are met." *Donoho*, 204 Ill. 2d at 176, 788 N.E.2d at 718.

In rejecting the defendant's challenge to the constitutionality of section 115-7.3 on equal protection grounds, the *Donoho* court noted as follows:

"The federal equal protection clause is not violated by Federal Evidence Rules 413 and 414, which allow the admission of evidence of other sexual assault or child molestation crimes to show propensity. In *United States v. Mound*, the Eighth Circuit Court of Appeals concluded that Rule 413 passes the rational basis test because it serves the legitimate purpose of promoting effective prosecution of sex offenses. [*United States v.*] *Mound*, 149 F.3d [799,] 801 [(8th Cir. 1998)]. In *United States v. Castillo*, the Tenth Circuit Court of Appeals found that Rule 414 passes the rational basis test because it responds to the greater need for corroborating evidence in cases involving sexual abuse of children given the fact that these cases often involve only the conflicting testimony of the defendant and the victim about crimes usually committed in secret. [*United States v.*] *Castillo*, 140 F.3d [874,] 803 [*sic*] [(10th Cir. 1998)].

Like Federal Rules of Evidence 413 and 414, section 115-7.3 allows the admission of other-crimes evidence to show propensity if the evidence is relevant and passes the prejudice/probative test. Under *Mound* and *Castillo*, we find that section

115-7.3 does not violate the federal equal protection clause. We agree that this provision passes the rational basis test because it also promotes effective prosecution of sex offenses and strengthens evidence in sexual abuse cases. Because we apply the same equal protection analysis under both the federal and state constitutions [citation], we also find that section 115-7.3 does not violate our state equal protection clause." *Donoho*, 204 Ill. 2d at 177-78, 788 N.E.2d at 719.

The *Donoho* court concluded, "[S]ection 115-7.3 constitutionally enables trial courts to allow the admission of evidence of other crimes to establish the propensity of defendant to commit the charged crime if the requirements of the section are met." *Donoho*, 204 Ill. 2d at 190, 788 N.E.2d at 726. Despite the defendant's arguments to the contrary, based on *Donoho*, any challenge to section 115-7.3 on equal protection grounds must fail.

However, the defendant also argues that the *Donoho* court did not address the issue of whether section 115-7.3 violates due process. Although the defendant in *Donoho* did not argue that section 115-7.3 violates due process, the *Donoho* court noted the following:

"Defendant concedes that no fundamental right is involved in this case. In addition, courts have held that admitting other-crimes evidence does not implicate the due process right to a fair trial where the evidence is relevant and its probative value is not outweighed by its prejudicial effect (see, *e.g.*, *United States v. Castillo*, 140 F.3d 874, 883 (10th Cir. 1998) (analyzing Federal Rule of Evidence 414)); these two limitations are incorporated into section 115-7.3 (725 ILCS 5/115-7.3(b), (c) (West 2000))." *Donoho*, 204 Ill. 2d at 177, 788 N.E.2d at 718.

Implicit in the above-quoted passage is the *Donoho* court's belief that section 115-7.3 does not violate due process. We agree.

In upholding the constitutionality of Rule 414 of the Federal Rules of Evidence (Fed. R. Evid. 414), which is analogous to section 115-7.3 of the Code, the Ninth Circuit rejected

27

the argument that the long-standing ban on the admission of propensity evidence qualifies as a "fundamental" principle of justice, at least when it comes to sex offenses. *United States v. LeMay*, 260 F.3d 1018 (9th Cir. 2001). The court concluded, "[A]s long as the protections of Rule 403 remain in place so that district judges retain the authority to exclude potentially devastating evidence, Rule 414 is constitutional." *LeMay*, 260 F.3d at 1027. As the *LeMay* court also noted:

> "Several courts have reached the same conclusion. In *Castillo*, for example, the Tenth Circuit noted that '[a]pplication of Rule 403 ... should always result in the exclusion of evidence' that is so prejudicial as to deprive the defendant of his right to a fair trial, and that 'application of Rule 403 to Rule 414 evidence eliminates the due process concerns posed by Rule 414.' 140 F.3d at 883. Applying nearly identical reasoning, the Tenth Circuit has also affirmed the constitutionality of Rule 413, which allows for propensity inferences in rape and sexual assault cases. *See United States v. Enjady*, 134 F.3d 1427, 1430-35 (10th Cir. 1998). Other courts have agreed. *See, e.g., United States v. Mound*, 149 F.3d 799, 800-802 (8th Cir. 1998) (concluding that Rule 413 passes constitutional muster if Rule 403 protections remain in place); *United States v. Wright*, 53 M.J. 476 (C.A.A.F. 2000) (same); *Kerr v. Caspari*, 956 F.2d 788, 790 (8th Cir. 1992) (holding that a Missouri rule allowing for propensity inferences in sex crime prosecutions is constitutional as long as Rule 403 test is applied).

> We join these courts in holding that Rule 414 does not violate the Due Process Clause of the constitution. The admission of relevant evidence, by itself, cannot amount to a constitutional violation. Nor does the admission of even highly prejudicial evidence necessarily trespass on a defendant's constitutional rights. Thus, the claim that Rule 414 is unconstitutional can be reduced to a very narrow question: 'whether admission of ... evidence that is both relevant under Rule [*sic*] 402 and not

28

overly prejudicial under 403 may still be said to violate the defendant's due process right to a fundamentally fair trial.' *Castillo*, 140 F.3d at 882. As the *Castillo* court noted, 'to ask that question is to answer it.' Rule 414 is constitutional on its face." *LeMay*, 260 F.3d at 1027.

As the legislative history quoted in *Donoho* indicates, section 115-7.3 was modeled after the Federal Rules of Evidence and permits the use of evidence of a defendant's commission of a sex crime to prove "any matter to which it is *relevant*" (emphasis added), provided it is more probative than prejudicial. 725 ILCS 5/115-7.3(b), (c), (d) (West 2004). Accordingly, for the same reasons that Rules 413 and 414 (Fed. R. Evid. 413, 414) are constitutional on their face, so, too, is section 115-7.3, and as long as the trial court properly balances the probative value of the evidence against its prejudicial effect, as did the trial court in the present case, the admission of the evidence does not violate due process. See *LeMay*, 260 F.3d at 1027; *Donoho*, 204 Ill. 2d at 177, 788 N.E.2d at 718.

The defendant next argues that he was denied a fair trial because, during the trial, his legs were shackled to the floor without cause. He argues that it "was a foregone conclusion" that he would be "chained down" and that the court ordered it *sua sponte*. The record does not support the argument that he was "chained down." Although the court considered the possibility of installing an eyebolt in the floor and securing the defendant to it, ultimately, he was not shackled to the floor. Instead, he wore a "leg device," which was hidden under his pants and prevented him from bending his knee enough to run. During the pretrial proceedings, the court was always adamant that the defendant would not appear cuffed before the jury and that the counsel tables would be skirted to hide any restraint from view. The discussion of security measures continued off and on throughout the pretrial proceedings with several opportunities to object, but defense counsel did not object and requested only that the defendant's handcuffs be removed so the jury could not tell he was restrained.

29

As the Illinois Supreme Court stated in *People v. Boose*, 66 Ill. 2d 261, 362 N.E.2d 303 (1977):

> "A defendant may be shackled when there is reason to believe that he may try to escape or that he may pose a threat to the safety of people in the courtroom or if it is necessary to maintain order during the trial. [Citations.] The determination is left to the discretion of the trial judge, and he may select the physical restraints most suitable in light of all the circumstances. [Citation.] The trial judge should state for the record his reasons for allowing the defendant to remain shackled, and he should give the defendant's attorney an opportunity to present reasons why the defendant should not be shackled. ***
>
> ***
>
> A reviewing court examines whether the trial court abused its discretion in requiring the defendant to appear shackled before the jury." *Boose*, 66 Ill. 2d at 266-67, 362 N.E.2d at 305-06.

In the present case, the State argues that the trial court did not abuse its discretion in allowing the restraints to remain on the defendant during the trial without conducting a *Boose* hearing. We disagree. The trial court did not perform a *Boose* analysis and did not state on the record its reasons for allowing the defendant to remain restrained during the trial; instead, the trial court deferred to the judgment of the deputy sheriff. As the Illinois Supreme Court stated in *People v. Allen*, 222 Ill. 2d 340, 856 N.E.2d 349 (2006):

> "[T]his abdication of the trial court's responsibility is not acceptable. 'The court must rigorously control its own courtroom procedures and, consistent with the mandates of due process, protect the rights of the parties and the public.' " *Allen*, 222 Ill. 2d at 348-49, 856 N.E.2d at 354 (quoting *People v. Martinez*, 347 Ill. App. 3d 1001, 1004, 808 N.E.2d 1089, 1092 (2004)).

30

However, as the State correctly argues, the defendant forfeited this issue by failing to object below. See *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988). Conceding the lack of an objection below, he argues that this court should review the issue under the plain-error doctrine (134 Ill. 2d R. 615(a)). Alternatively, he argues that he received the ineffective assistance of counsel when his attorney failed to object below.

"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 134 Ill. 2d R. 615(a). As the Illinois Supreme Court explained in *People v. Herron*, 215 Ill. 2d 167, 830 N.E.2d 467 (2005):

> "The plain-error doctrine *** allows a reviewing court to reach a forfeited error affecting substantial rights in two circumstances. First, where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence, a reviewing court may consider a forfeited error in order to preclude an argument that an innocent person was wrongly convicted. [Citations.] Second, where the error is so serious that the defendant was denied a substantial right, and thus a fair trial, a reviewing court may consider a forfeited error in order to preserve the integrity of the judicial process. [Citations.] This so-called disjunctive test does not offer two divergent interpretations of plain error, but instead two different ways to ensure the same thing–namely, a fair trial." *Herron*, 215 Ill. 2d at 178-79, 830 N.E.2d at 475.

The defendant argues that we should follow *People v. Doss*, 347 Ill. App. 3d 418, 807 N.E.2d 697 (2004), which has been interpreted as holding that restraining a defendant without considering the *Boose* factors is automatically plain error not subject to forfeiture. See *People v. Brown*, 356 Ill. App. 3d 1088, 1090-01, 828 N.E.2d 351, 354 (2005). However, the Illinois Supreme Court repudiated that view in *Allen*, 222 Ill. 2d at 351-52, 856 N.E.2d at 355-56. The *Allen* court agreed with this court's holding in *People v. Crutchfield*,

353 Ill. App. 3d 1014, 1021, 820 N.E.2d 507, 514-15 (2004), that even constitutional errors can be forfeited if the error is not of such magnitude that it deprives the defendant of a fair trial. *Allen*, 222 Ill. 2d at 352, 856 N.E.2d at 356. The *Allen* court stated as follows:

"[W]hile defendant *** has proven a due process violation which amounted to error by showing that he was required to wear [a restraint] at trial without the court having first determined that it was necessary, defendant has failed to persuade this court 'that the error was so serious that it affected the fairness of [his] trial and challenged the integrity of the judicial process.' [Citations.]

*** [D]efendant cannot, and does not, claim that the evidence presented was closely balanced. Further, he has not shown that his presumption of innocence, ability to assist his counsel, or the dignity of the proceedings was compromised. In fact, defendant wore the [restraint] into the third day of his jury trial with no objection, complaint, or any apparent difficulty consulting with his counsel. Thus, *** although the failure to conduct a *Boose* hearing under these circumstances is an error, defendant's failure to object and to carry his burden of persuasion amounts to forfeiture of the error, where he cannot establish that it prevented him from obtaining a fair trial. [Citations.]" *Allen*, 222 Ill. 2d at 353-54, 856 N.E.2d at 356-57.

Similarly, in the present case, the defendant has failed to show that the evidence was closely balanced or that his presumption of innocence, his ability to assist his attorney, or the dignity of the proceedings was compromised. In fact, he wore the restraint throughout the jury trial without any objection, complaint, or apparent difficulty in consulting with his attorney. Thus, although the trial court erred in failing to conduct a *Boose* hearing under these circumstances, the defendant forfeited the error by failing to object and to meet his burden of persuasion because he failed to show that it prevented him from receiving a fair trial. See *Allen*, 222 Ill. 2d at 351-54, 856 N.E.2d at 355-57.

We turn then to the defendant's ineffective-assistance argument. As the Illinois Supreme Court explained in *People v. Graham*, 206 Ill. 2d 465, 795 N.E.2d 231 (2003):

"Ineffective[-]assistance[-]of[-]counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). [Citation.] Under *Strickland*, a defendant must prove that defense counsel's performance fell below an objective standard of reasonableness and that this substandard performance created a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. [Citation.] A reasonable probability is a probability sufficient to undermine confidence in the result at trial. [Citation.] Unless the defendant makes both showings, we cannot conclude that he received ineffective assistance. [Citation.] That is, if an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient. [Citation.]" *Graham*, 206 Ill. 2d at 476, 795 N.E.2d at 238.

In the present case, the record demonstrates that the restraint was not visible to the jury, that the defendant was not prejudiced by having to wear it, and that there is no reasonable probability that the result of the trial would have been different had the defendant not been wearing the restraint. Accordingly, the defendant's ineffective-assistance-of-counsel claim fails. See *Graham*, 206 Ill. 2d at 476, 795 N.E.2d at 238.

The defendant next argues that he was denied a fair trial because the State used his postarrest silence and request for an attorney against him. Specifically, he complains of the following portion of Patrick's testimony: "I asked [the defendant] if he was willing to speak with me[;] he initially said yes[;] when I got a printed copy of the *Miranda* rights he stated he better wait for an attorney[;] so I didn't interview him." Conceding the lack of an objection below, he argues that we should review the issue under the plain-error doctrine or,

33

alternatively, that his counsel was ineffective for failing to object to the testimony.

When presented with almost identical arguments in *Graham*, the Illinois Supreme Court rejected the plain-error argument, stating:

"[T]he State presented strong evidence of the defendant's guilt, and the first prong of the plain[-]error rule does not apply. Further, 'a comment upon a defendant's post[]arrest silence, while improper, is not an error of such magnitude as to clearly deprive the defendant of a fair trial.' [Citations.] Thus, the second prong also does not apply, and the defendant's plain[-]error argument fails." *Graham*, 206 Ill. 2d at 475-76, 795 N.E.2d at 238.

Similarly, in the present case, the State presented strong evidence of the defendant's guilt, and he has made no effort to demonstrate that the evidence was closely balanced. Accordingly, the first prong of the plain-error rule is inapplicable. In addition, Patrick's brief comment about the defendant's postarrest silence and request for counsel, while improper, is not an error of such magnitude that it clearly deprived him of a fair trial. In fact, the defendant has made no effort to demonstrate that the error was so serious that it deprived him of a fair trial. Therefore, the second prong is also inapplicable, and the defendant's plain-error argument fails. See *Graham*, 206 Ill. 2d at 475-76, 795 N.E.2d at 238.

In rejecting the ineffective-assistance claim in *Graham*, the court stated:

"[T]he State presented strong evidence of the defendant's guilt ***. Further, [the assistant State's Attorney's] comment that the defendant 'didn't want to talk' was a minor part of his testimony on direct examination. Similarly, the State's passing, though erroneous, comment that the defendant requested an attorney while speaking with [the assistant State's Attorney] was a minor part of its closing argument ***. Because we cannot say that the result of the defendant's trial would have been different if [defense counsel] would have objected to these comments, the defendant's

34

argument fails." *Graham*, 206 Ill. 2d at 476-77, 795 N.E.2d at 238.

Similarly, in the present case, the evidence was not closely balanced, and Patrick's statement about the defendant's postarrest comment that "he better wait for an attorney" before speaking to him was a minor part of his testimony. Moreover, in the present case, unlike in *Graham*, the prosecutor did not even comment on that portion of Patrick's testimony. Therefore, because the defendant has failed to demonstrate that there is a reasonable probability that the result of his trial would have been different if his counsel had objected to Patrick's testimony about his postarrest silence and request for counsel, his ineffective-assistance claim fails. See *Graham*, 206 Ill. 2d at 476-77, 795 N.E.2d at 238.

The defendant next argues that he was denied a fair trial because the trial court's rulings blocked crucial defense evidence of recantation. He argues that he was prepared to have Diane Durbin testify that Paula told her that the January 27, 2003, incident was consensual and that Durbin's testimony was crucial to impeach Paula. However, Durbin told the State's investigators that she was afraid of the defendant, that he had been violent toward her, that he had raped her, and that he had threatened to violate her daughter when she turned 16. The trial court ruled that if the defense called Durbin to testify that Paula had told her the incident was consensual, the State would be entitled to cross-examine her regarding any interest, bias, or motive she might have, including any fear she might have that was based upon the defendant's prior domestic violence against her. Thus, the trial court ruled that the State could impeach Durbin under traditional, well-accepted standards. Despite the defendant's allegation to the contrary, the trial court did not rule that the State could use Durbin's 18-year-old rape claims against him as "propensity evidence." The defense did not call Durbin as a witness, and Paula denied telling Durbin that she had made up the rape claim against the defendant.

The defendant claims that the court erred in ruling that the State could impeach

35

Durbin with his violent acts against her because those acts occurred in 1989 and the trial court had precluded the State from presenting evidence of a 1994 assault of Paula during its case in chief, determining that it was too old. We disagree. At the trial, Durbin's *current* fear of the defendant was based on her *past* experiences with him. She knew what could happen to her if she did not help him. Her previous experiences with him were probative with regard to whether she had conflicting interests and biases that might affect her testimony. Moreover, the State was not barred from using the 1994 assault to impeach witnesses; the trial court simply ruled that the State could not use it in its case in chief. In addition, the trial court did not foreclose Durbin's testimony; it simply informed defense counsel that he would have to consider the potential impeachment in determining whether to call her as a witness.

We reject the defendant's argument that Durbin had no motive to testify falsely because if he was convicted, he would be imprisoned for life. His conviction was not assured, and she could not be sure that, once imprisoned, he would never be released. Therefore, she had good reason to stay on the defendant's good side, and the jury was entitled to know her possible motive to lie.

The defendant next argues that he was denied a fair trial because the trial court blocked his right to confront Michelle with evidence of bias or motive. Specifically, he argues that the trial court erred in refusing to allow him to impeach Michelle with testimony that she and Paula had a sexual relationship, which would have provided a motive for her to lie. He argues that both he and Dustin were prepared to testify that Michelle and Paula "were sexual partners" and that the circuit court ruled that this evidence was inadmissible. We find no evidence in the record to support this claim. Instead, the record indicates that the defendant wanted to ask Paula "if she engaged in a threesome" with him and Michelle.

As the Illinois Supreme Court stated in *People v. Peeples*, 155 Ill. 2d 422, 616 N.E.2d

36

294 (1993):

"When a trial court refuses evidence, no appealable issue remains unless a formal offer of proof is made. [Citation.] The purpose of an offer of proof is to inform the trial court, opposing counsel, and a reviewing court of the nature and substance of the evidence sought to be introduced. [Citations.] Where it is not clear what a witness would say, or what his basis would be for saying it, the offer of proof must be considerably detailed and specific. A reviewing court can thereby know what was excluded and determine whether the exclusion was proper. [Citations.] 'The failure to make an adequate offer of proof results in a waiver of the issue on appeal.' [Citation.]

However, an offer of proof is not required where it is apparent that the trial court clearly understood the nature and character of the evidence sought to be introduced, or where the question itself and the circumstances surrounding it show the purpose and materiality of the evidence. [Citations.]" *Peeples*, 155 Ill. 2d at 457-58, 616 N.E.2d at 310.

Conceding his failure to make an offer of proof, the defendant argues that this court can review the decision because we know the content of the excluded evidence. We disagree. Because the defendant failed to make an offer of proof, neither the trial court nor this court knows what, if anything, Dustin or the defendant would have testified to in this regard or what would have been the basis for their testimony. Thus, we cannot say that the trial court clearly understood the nature and character of the evidence sought to be introduced, we cannot review any alleged error in its exclusion, and the issue is forfeited on appeal. See *Peeples*, 155 Ill. 2d at 457-58, 616 N.E.2d at 310.

The defendant next argues that he was denied a fair trial because the prosecutor failed to correct Jarrod Clark's perjured testimony that he pleaded guilty in exchange for a seven-

year prison sentence, when he actually received two concurrent four-year sentences. Clark testified on behalf of the State that the defendant had confessed the crime to him while they were housed in the same cellblock. On cross-examination, defense counsel questioned Clark about his guilty plea deal, and Clark testified that he had been sent to prison for "7 years" and had a guilty plea arrangement that had nothing to do with the defendant. Clark testified that he hoped the prosecutor might take his assistance "into account in the future." The defendant argues that Clark committed perjury, that the prosecutor knew that Clark had committed perjury and failed to correct it, and that the perjured testimony harmed him.

The defendant failed to raise this alleged error below and has not demonstrated that the prosecutor's failure to correct Clark's erroneous testimony amounted to plain error. The State presented strong evidence of the defendant's guilt, and he has made no effort to demonstrate that the evidence was closely balanced. Accordingly, the first prong of the plain-error rule is inapplicable. In addition, the alleged error is not of such magnitude that it clearly deprived the defendant of a fair trial. The defendant and Dunaway both testified that the defendant did not confess to Clark. The jury knew that Clark had been charged with possession of methamphetamine-manufacturing materials and burglary and that he hoped his testimony would help his case. His bias was evident to the jury. Whether he was sentenced to four years or seven years would not have affected the jury's verdict, especially where no one ever mentioned the statement again. Therefore, the second prong of the plain-error rule is also inapplicable, and the defendant has forfeited the issue on appeal. See *Graham*, 206 Ill. 2d at 475-76, 795 N.E.2d at 238.

In addition, because the defendant has failed to demonstrate a reasonable probability that the result of his trial would have been different had his counsel shown that Clark was sentenced to two concurrent four-year sentences instead of seven years, his ineffective-assistance claim fails. See *Graham*, 206 Ill. 2d at 476-77, 795 N.E.2d at 238.

The defendant next argues that he was denied a fair trial because the State did not disclose the content of Patrick's interview with Dunaway, wherein Dunaway told Patrick that he, too, heard the defendant admit raping his wife, and the trial court allowed Patrick to testify in rebuttal about the content of the interview. The State does not dispute that Supreme Court Rule 412 (188 Ill. 2d R. 412) required it to disclose the content of Patrick's interview with Dunaway. Instead, the State claims that it did disclose the report.

When the State called Patrick in rebuttal, defense counsel objected to Patrick's testimony, stating that he had never seen Patrick's report of the interview with Dunaway. The prosecutor responded, "I've disclosed it *** two or three times." The trial court noted that it had no reason to believe that it had not been disclosed and, in fact, "specifically recall[ed]" that the fact that Dunaway had given inconsistent statements had come up in the course of the pretrial proceedings. After the court gave defense counsel an opportunity to review his file and to review the report, defense counsel claimed that he had a part, but not all, of the report containing Patrick's interview with Dunaway. The prosecutor stated, "Your Honor, I did disclose these matters." Again, the trial court stated that it remembered the issue coming up at a prior hearing–when the prosecutor said that he was going to call Clark, defense counsel indicated that Dunaway would say it did not happen, and the prosecutor indicated that Dunaway had made prior inconsistent statements. The trial court concluded that even if there was some confusion that resulted in the actual page being inadvertently omitted, it was clearly shown that there was a prior inconsistent statement and that defense counsel knew this before he called Dunaway to testify at the trial. The trial court's conclusion that defense counsel was aware of Dunaway's prior inconsistent statement is supported by defense counsel's own words. On direct examination, after Dunaway had testified that Clark's statement to the police was false, defense counsel specifically asked Dunaway: "[D]id you give any other statements? Wasn't there some other statement you

39

made at some point?" Dunaway's response was, "Not that I am aware of."

Patrick's report of Dunaway's interview is not contained in the record, nor does the record indicate when the prosecutor disclosed the report to defense counsel. However, the prosecutor was adamant that he had disclosed the report, the trial court distinctly remembered that counsel had discussed the issue prior to the trial, defense counsel acknowledged that he had at least a part of the report, and defense counsel's questioning of Dunaway on direct examination indicates that he was aware that Dunaway might have made another statement. Accordingly, the trial court did not abuse its discretion in allowing Patrick's rebuttal testimony regarding his interview with Dunaway.

The defendant next argues that he was denied a fair trial by the State's repeated and overwhelming presentation of prior consistent statements as if they corroborated the State's case. The defendant failed to raise this alleged error below and has failed to demonstrate that the prosecutor's presentation of prior consistent statements amounted to plain error. The State presented strong evidence of his guilt, and he has made no effort to demonstrate that the evidence was closely balanced. Accordingly, the first prong of the plain-error rule is inapplicable. In addition, the alleged error is not an error of such magnitude that it clearly deprived him of a fair trial. See *People v. Dibble*, 317 Ill. App. 3d 252, 258-59, 739 N.E.2d 578, 583 (2000). Therefore, the second prong of the plain-error rule is also inapplicable, and he has forfeited the issue on appeal. See *Graham*, 206 Ill. 2d at 475-76, 795 N.E.2d at 238.

Finally, because the defendant has failed to demonstrate that there is a reasonable probability that the result of his trial would have been different if his counsel had objected to the admission of the prior consistent statements, his ineffective-assistance claim also fails. See *Graham*, 206 Ill. 2d at 476-77, 795 N.E.2d at 238.

Finally, the defendant argues that he was denied the effective assistance of counsel. We have already addressed most of his ineffective-assistance claims, which dealt with trial

40

counsel's failure to object to the errors discussed above, and need not discuss them further.

The defendant's first ineffective-assistance claim not already discussed is that defense counsel was ineffective for failing to challenge statements attributed to Paula that she had oral sex with him and that he ejaculated on her. There are only two references to ejaculation in the record. First, during his grand jury testimony a month and a half after the assault, Patrick stated that Paula told him that the defendant had ejaculated on her; however, this statement contradicts Patrick's written investigative report filed the day after the assault, which says nothing about ejaculation. In addition, none of Paula's statements, including her statements to medical care providers, friends, and family, ever mentioned ejaculation. The only other mention of ejaculation came from Clark, who testified that the defendant said he had ejaculated on Paula. The defendant, himself, while on the stand, pointed out the inconsistency of Clark's statement about ejaculation, which was presented nowhere else in the testimony, and noted that Paula said he never ejaculated. Choosing not to present evidence of Patrick's grand jury testimony referencing ejaculation and, instead, impeaching Clark with this inconsistency was sound trial strategy, not the ineffective assistance of counsel.

The only other inconsistency in Paula's statement is that the nurse's report indicated oral sex during the assault, but Paula did not mention that anywhere else. However, defense counsel pointed out this inconsistency when cross-examining the nurse and, in arguing that Paula was not credible, mentioned it in closing argument. Accordingly, this single omitted question to Paula could not have so prejudiced the defendant that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. Furthermore, impeaching Paula by presenting even more evidence of sexual abuse, including the forced oral sex and ejaculation (particularly in the manner described by Clark), probably would have made the defendant look even worse than he already did.

41

Because trial counsel's decision not to impeach Paula with alleged statements about oral sex and ejaculation was sound trial strategy and because it did not prejudice the defendant, there was no ineffective assistance based on counsel's failure to challenge these inconsistencies.

The defendant also claims that defense counsel was ineffective for failing to admit Paula's notarized recantation as substantive evidence that the 1998 assault did not occur. The jury was properly instructed that prior inconsistent statements are admitted to help determine the credibility of the person making the statement. The defendant seems to believe that if Paula's 1998 recantation had been admitted substantively, he could have proved that he did not commit the 1998 assault. It is difficult to determine how the substantive use of Paula's recantation could have proved that the assault did not occur, given the following facts: Paula made the recantation before the defendant pleaded guilty; at his guilty plea, he admitted, in Paula's presence, that he placed his fist in her vagina and anus and struck her on the back and thigh with his fist; and he did not raise the recantation issue in any posttrial motion, appeal, or postconviction petition. Moreover, the trial court warned defense counsel that if the defendant went into depth on Paula's recantation, the State would be allowed to present rather graphic testimony regarding her medical condition after the assault that the defendant now claims never occurred. Thus, the decision not to seek to have the statement admitted substantively was sound trial strategy. Whether it is considered for impeachment or substantively, the only thing Paula's 1998 recantation proves is that she has made inconsistent statements about the defendant's assaults on her, and it was admitted for that purpose. Accordingly, there was no ineffective assistance of counsel.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Christian County is affirmed.

42

Affirmed.

SPOMER and WEXSTTEN, JJ., concur

NO. 5-05-0511

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Christian County. |
| | ) | |
| v. | ) | No. 03-CF-20 |
| | ) | |
| KYLE W. BEATY, | ) | Honorable |
| | ) | Ronald D. Spears, |
| Defendant-Appellant. | ) | Judge, presiding. |

**Opinion Filed**:        December 27, 2007

**Justices**:       Honorable Bruce D. Stewart, P.J.

Honorable Stephen L. Spomer, J.
Honorable James M. Wexstten, J.
Concur

**Attorneys
for
Appellant**      Daniel M. Kirwan, Deputy Defender, Larry R. Wells, Assistant Defender, Office
of the State Appellate Defender, Fifth Judicial District, 117 N. Tenth Street,
Suite 300, Mt. Vernon, IL 62864

**Attorneys
for
Appellee**      Hon. Brad Paisley, State's Attorney, Christian County Courthouse, 101 S. Main
Street, Taylorville, IL 62568; Norbert J. Goetten, Director, Stephen E. Norris,
Deputy Director, Sharon Shanahan, Contract Attorney, Office of the State's
Attorneys Appellate Prosecutor, 730 E. Illinois Highway 15, Suite 2, P.O. Box
2249, Mt. Vernon, IL 62864