Sixth Division
November 5, 2010

No. 1-08-3052

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the Circuit Court |
| | ) | of Cook County |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | 05 CR 21830 |
| | ) | |
| TYRONE EVERHART, JR., | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Michele M. Simmons, |
| | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the opinion of the court:

Following a jury trial, defendant Tyrone Everhart, Jr., was found guilty of aggravated criminal sexual assault. The trial court subsequently sentenced him to natural life in prison.

Defendant appeals, arguing that: (1) his trial counsel was ineffective because he told the jury in opening statements that defendant would testify and tell them what really happened but defendant did not testify at trial; (2) the trial court improperly admitted evidence of defendant's prior conviction for aggravated criminal sexual assault; (3) section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2006)) violates defendant's due process rights; (4) the trial court erred in admitting evidence about a replica pistol lighter into evidence; (5) the State failed to prove defendant acted in a manner to threaten or endanger life as required under the aggravated criminal sexual assault statute (720 ILCS 5/12-14(a)(3) (West 2006)); and (6) the cumulative effect of these trial errors deprived defendant of a fair trial.

In June 2006, prior to trial, the State filed a motion to allow evidence of defendant's previous conviction from 1994 for aggravated criminal sexual assault. The trial court found multiple factual similarities between the two offenses and held that the evidence of other crimes

was admissible at trial to show defendant's propensity. Defendant filed a motion to reconsider the ruling in September 2008, but the motion was denied.

The following evidence was presented at defendant's September 2008 jury trial.

D.R. testified that on May 7, 2005, she worked part-time as a bartender at Danny T's, located at 159th and Markham in Markham, Illinois. She closed the bar between 2 and 2:30 a.m. and drove home around 3 a.m. She drove her silver Neon about three miles to her apartment at 16031 Laramie Avenue in Oak Forest. She did not see anyone follow her and did not see anyone else when she entered the parking lot of her building. There were no lights in the parking area, but a small light was on above the door to her building. D.R. parked in her assigned parking space behind her building near a wooded area and then walked to her door. She was carrying a purse and had her keys in her hand.

When she put her key in the door, someone grabbed her from behind and pulled her to the ground. She did not see the person's face. She tried to scream, but the offender's arm was over her mouth. The man told her to "shut up," and not to scream. He asked if she had any money and she said to take her purse. The man placed an object to D.R.'s head and asked her if she knew what it was. He made her reach up and touch the object. D.R. stated that it was cold, hard metal and it felt like a gun. He said, "If you scream or fight, I'll blow your f---ing head off." D.R. stopped screaming. She testified that she believed the man held a gun to her head.

The man asked D.R. if she would cooperate, and she responded that she would. She described the voice as calm and clear, with no accent. He made her get up and walk back to where her car was parked. As they walked, the man kept his arm around her and the gun pressed to her head. At the car, the man bent D.R. over the hood of the car and again asked if she was

2

going to cooperate. She said yes. The man told D.R. to take off her pants and underwear. The man then inserted his penis into her vagina. He asked her if she liked it and told her to say that she "liked it" and "wanted his f---ing c--- in [her]." She estimated that the sexual assault lasted five to six minutes.

After the man finished, he pulled up his pants, but told D.R. not to touch hers. He lifted her from the hood of the car and told her "not to scream or make any noise or he would blow [her] f---ing head off again." The man then walked her into the trees behind her building, near a creek. She was facing the trees. He told her to stay there and count to 20, but if he heard her move or stop counting, then "he would blow [her] head off." He let go and D.R. started counting.

D.R. stated that she heard him walking back toward the door and could tell that he had picked up her purse. She heard him walk around to the front of the building. Then, she heard a car door slam and a car leaving. She pulled up her pants and walked toward her car. She looked for her cell phone, but could not find it. D.R. testified that her purse was gone, but her keys were still in the door. She went inside and woke her oldest son to use his cell phone. She called 911 and told the operator that she had been attacked outside her building. She did not tell the operator that she had been sexually assaulted because she did not want to say that in front of her son. The police arrived while she was still on the phone with the operator. D.R. told Officer James Morrissy what happened and he called for an ambulance. D.R. went to South Suburban Hospital for an examination.

D.R. testified that she does not know defendant's name and did not recognize anyone in the courtroom other than the prosecutors. She could not describe the offender and was unable to

identify anyone from photographs.

Officer James Morrissy testified that he was a patrol officer with the Oak Forest police department on May 7, 2005. He received a dispatch at 3:21 a.m. to investigate a robbery at 16031 Laramie Avenue. When he arrived, Officer Morrissy heard a vehicle running and approached the vehicle. He determined that the man in the car lived in the building and was running an errand for his pregnant wife. Officer Morrissy concluded that the man was unrelated to the robbery.

Officer Morrissy went to D.R.'s apartment and D.R. came outside. She was sobbing. She told Officer Morrissy what happened, including the sexual assault. He advised his supervisor of the sexual assault and called for a detective and an ambulance. He observed that she was wearing pants and a t-shirt and that her clothes were not ripped or dirty. D.R. took him to the location where the sexual assault occurred. He saw that the hood of D.R.'s car was dirty, except for one spot that was "unusually clean." He also noticed a milky substance on the ground and informed the detective about it.

Officer Morrissy testified that D.R. told him that the offender put an object to her head, but she did not tell him that she reached up and felt the object. D.R. was unable to tell him how long the attack lasted. D.R. did not tell him that she tried to scream, but the offender covered her mouth. Officer Morrissy stated that D.R. told him that she pulled up her pants immediately after the assault and did not tell him that she walked into the woods with her pants down.

Officer Morrissy followed the ambulance transporting D.R. to South Suburban Hospital. He waited outside the room while the medical personnel collected evidence for the sexual assault kit. He was later given the sealed kit, two sealed envelopes with D.R.'s bra and underwear, and a

paper bag with her pants. He gave D.R. a ride home and then took the sexual assault kit and other items to the police station. He placed them in a locked evidence locker for the investigating detective.

Nancy Healy testified that on May 7, 2005, she was training to be a sexual assault nurse examiner (SANE) at South Suburban Hospital. Healy assisted a SANE certified nurse in treating D.R. She stated that D.R. appeared "distraught," "trembling," "quiet," and "upset." Healy and the SANE nurse collected evidence for the sexual assault kit, including mouth, vaginal and anal swabs, a blood sample, fingernail specimens, public hair combings, a swab from D.R.'s right ear and D.R.'s clothing. Healy stated that D.R. had "an abrasion to the 7:00 o'clock position" outside the vaginal opening, which Healy explained was a common injury with vaginal penetration. Healy testified that D.R. had no other bruises or injuries to her body.

Officer Dwayne Pulchinski testified that he was on patrol for the Tinley Park police department on May 7, 2005. He recovered a blue checkbook cover with a checkbook from the intersection of 159th Street and Oak Park Avenue at approximately 4:40 a.m. The checkbook contained checks belonging to D.R. Officer Pulchinski photographed the checkbook and notified his dispatch about the recovered checkbook. The Oak Forest police department was notified and Officer Pulchinski turned it over to Detective Rich Belcher of the Oak Forest police department.

Sergeant Scott Durano testified that on May 7, 2005, he was a street supervisor and a K-9 handler with the Oak Forest police department. He heard the dispatch regarding an armed robbery at 16031 Laramie and responded to the scene. Sergeant Durano used the K-9 unit dog attempt to locate the suspect, but was unsuccessful. Later, he heard about the discarded checkbook and went to look for other discarded objects. While driving north on Oak Park

Avenue near 156th Street, Sergeant Durano saw a reddish change purse. He notified Detective Belcher, who came to the scene and recovered the item.

Detective Rich Belcher testified that he was called to respond to South Laramie Avenue at approximately 3:30 a.m. on May 7, 2005. When he arrived at the location, Officer Morrissy and Sergeant Durano informed him of the robbery and sexual assault. Detective Belcher did not speak with D.R. at the scene because Officer Morrissy had a rapport with her and she was upset. Detective Belcher photographed the scene around D.R.'s car and collected evidence. Specifically, he took a sample of a liquid drop in front of the car and a cigarette butt.

At around 4:40 a.m., he received a call from dispatch informing him that a Tinley Park officer had recovered D.R.'s checkbook. He went to the scene. He photographed the checkbook and put the checkbook cover into evidence. At approximately 5 a.m., he received another call advising him of Sergeant Durano's recovery of a change purse. He went to that location, photographed the change purse, and collected it for evidence. Later, around 9 a.m., Officer Morrissy returned from the hospital with the sealed sexual assault kit and D.R.'s clothing. Detective Belcher took the items and entered them into evidence.

On May 9, 2005, Detective Belcher met with D.R. at the police station. She identified the checkbook and change purse as belonging to her. She noted that she was not missing any checks. Detective Belcher returned the change purse and checkbook to her, but kept the checkbook cover because it had smooth vinyl surface suitable for fingerprints. D.R. told Detective Belcher that "she felt a weapon was placed against her head and she was told by the offender 'if you don't cooperate or do what I say, I will blow your f---ing brains out.' " D.R. did not tell him that the offender pulled her to the ground or that she tried to scream but was told to stop. D.R. also did

6

not tell him that the offender walked with her to the woods while her pants were down.

The following day, on May 10, 2005, Detective Belcher took the evidence to the Illinois State Police crime lab in Joliet. In June 2005, he received information from Katherine Sullivan (formerly Katherine Davis) from the crime lab that semen had been recovered from D.R.'s underwear and vaginal and anal swabs. Later that month, he received information from Sullivan and based on that information, he had a suspect. He got a photograph of the suspect and showed D.R. a photo array, but she was unable to recognize anyone.

On June 28, 2005, Detective Belcher went to an address in Markham and defendant answered the door. Detective Belcher identified defendant from the photograph and placed him under arrest. Defendant's girlfriend was present at this time. She gave verbal and written consent for Detective Belcher to search her car, which was parked in front of the residence. Detective Belcher recovered "a small semi-automatic pistol look-a-like lighter" from the center console of the vehicle. He placed the lighter into evidence and transported defendant to the police station.

Later that afternoon, Detective Belcher spoke with defendant at the Oak Forest police station. He read defendant his <u>Miranda</u> rights. Defendant stated that he understood his rights, but refused to sign the <u>Miranda</u> waiver form. Detective Belcher wrote "refused" on each line of the form and noted that defendant would not initial the form. Detective Belcher continued the conversation because defendant verbally indicated that he understood his rights. Detective Belcher told defendant why he was under arrest. He asked defendant if he knew D.R., and defendant said he did not. Detective Belcher also asked defendant if he knew any women from Oak Forest and if he ever had nonconsensual sex with any women from Oak Forest. Defendant said he had not. Defendant was returned to his cell and Detective Belcher obtained a warrant for

a buccal swab from inside defendant's mouth.

Later that evening, Detective Belcher met with Assistant State's Attorney (ASA) Nick Karas. Detective Belcher, Karas and another detective from Tinley Park spoke with defendant. ASA Karas read defendant his <u>Miranda</u> rights and this time defendant signed the waiver form. Defendant agreed to give a statement.

Defendant told ASA Karas and the detectives that he was on southbound Cicero Avenue at 159th Street when he saw a small silver car drive through the intersection with a lone white female driver. He followed that car westbound on 159th Street and saw the car turn onto Laramie Avenue. He went past that intersection, made a U-turn and then turned onto Laramie. He could still observe the silver car's taillights. He continued to follow the car to the address of 16031 South Laramie. When he turned into the apartment complex, he lost sight of the car for awhile, but he saw the light go on inside the car when D.R. opened her car door.

Defendant said he waited until D.R. was approaching the rear door of her building. He "followed up from behind her, threatened her life, brought her to the front of her car, had her bend over, had her pull her pants down and sexually assaulted her." Defendant told them he made D.R. walk into a small wooded area in front of her car. He then picked up her purse and cell phone and ran to his car. He left, driving north on Laramie and then west on 159th. He discarded things from D.R.'s purse as he was driving, only keeping the money.

ASA Karas also testified substantially the same as Detective Belcher regarding the details of defendant's oral statement. ASA Karas asked defendant to memorialize his statement, but defendant refused to write down or videotape his statement.

Katherine Sullivan testified that she is a forensic scientist with the Illinois State Police

8

crime lab as an expert in forensic biology. Sullivan stated that she analyzed the evidence in this case and discovered trace amounts of semen in D.R.'s underwear and her vaginal and anal swabs. She created a DNA profile from that evidence. Later, she received defendant's buccal swab and compared the DNA profile from the swab to the DNA profile from vaginal and anal swabs and underwear. She concluded the DNA profiles were a match to defendant.

Michael Tardy testified that in 1994, he was the supervisor for the detectives division of the Hickory Hills police department. In November 1994, he was assigned to investigate the criminal sexual assault of G.C. He had defendant in custody as a suspect in that case. Tardy identified defendant in court as the suspect in the 1994 case. Tardy admitted that he had no knowledge or involvement in the current case.

G.C. testified that in 1994, she was 20 or 21 years old. At about 12:30 a.m. on November 30, 1994, G.C. was at a grocery store in Hickory Hills. When she was about to enter her car, a person came up behind her, told her to move over and pushed her into the passenger seat of the car. The offender told her he had a gun and told her to give him her keys. The offender told her not to look at him and to keep her head down. G.C. said she begged him to take her purse and her money. She felt an object at her side and she believed it was a gun. The man proceeded to drive her car to another location. He stopped the car and told her to remove her pants and shoes.

The offender then began to kiss her and rub her breasts over and under her clothes and vagina. He made her turn around and bend over the back of the car seat. The offender then rubbed her buttocks and inserted his fingers into her vagina and anus. G.C. testified that she did not know how long it lasted because "it seemed like forever. It may be half hour [*sic*]." While this was happening, the offender told her that he was not going to hurt her, but not to say

9

anything because he knew the police and would find out. He said he had her purse and knew where she lived. G.C. described his voice as very calm and very stern. When he finished, she put her clothes and shoes back on.

Defendant told G.C. to keep her head down and not to look at him. He continued to hold an item he said was a gun to G.C.'s side. She cooperated with him. Defendant drove around and eventually stopped the car. He told G.C. to get out of the car, but she did not at first because she was scared that he would shoot her. She exited the car and defendant left. She called a roommate to pick her up and then she called the police.

G.C. identified defendant in court as the man who sexually assaulted her in 1994. She admitted that defendant pled guilty in her case. She testified that she did not know anything about the current case.

The State rested after G.C.'s testimony. Defense counsel moved for a directed verdict, which the trial court denied. Defense counsel then informed the trial court that they had advised defendant not to testify. The court then admonished defendant about his right to testify. Defendant indicated on the record that he understood his right and, after speaking with his attorneys, he decided not to testify. The defense did not present any evidence.

Following deliberations, the jury found defendant guilty of aggravated criminal sexual assault. At the sentencing hearing, the trial court sentenced defendant to natural life in prison pursuant to section 12-14(d)(2) of the Criminal Code of 1961 (720 ILCS 5/12-14(d)(2) (West 2008)) because this was defendant's second conviction for aggravated criminal sexual assault.

This appeal followed.

Defendant first argues that his trial counsel was ineffective because he promised the jury in

10

his opening statement that defendant would testify and tell the jury that the sex was consensual, but defendant did not testify and no evidence was presented by the defense. The State maintains that defendant received effective assistance of counsel.

Claims of ineffective assistance of trial counsel are resolved under the standard set forth in Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). In Strickland, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under Strickland, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. To demonstrate performance deficiency, a defendant must establish that counsel's performance was below an objective standard of reasonableness. People v. Edwards, 195 Ill. 2d 142, 163 (2001). In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. Strickland, 466 U.S. at 697, 80 L. Ed. 2d at 699-700, 104 S. Ct. at 2069. This determination must be made on the basis of the entire record, not isolated instances. People v. Kluppelberg, 257 Ill. App. 3d 516, 526 (1993). Effective assistance of counsel refers to competent, not perfect, representation. People v. Palmer, 162 Ill. 2d 465, 476 (1994).

"A counsel's failure to provide promised testimony is not ineffective assistance *per se*."

11

1-08-3052

People v. Manning, 334 Ill. App. 3d 882, 892 (2002); see also People v. Schlager, 247 Ill. App. 3d 921, 932 (1993) ("the test is not whether defense counsel fulfilled all the promises he made during his opening remarks but, rather, whether defense counsel's errors were so serious that, absent those errors, the result of the proceeding would likely have been different").

During opening statements, defense counsel stated:

"Finally, Mr. Everhart is going to get up here on the stand, and he's going to tell you what happened. He's going to tell you that on that night, there was no criminal sexual assault. He's going to tell you that there was sexual conduct between himself and the victim, but that that sex was consensual. He'll tell you about how he knows her. And he'll tell you about the occasions prior to this event where he had relations with the victim.

Finally, you'll hear him talk about, after he got arrested, the circumstances around that statement. You'll hear what he actually told the police officers. Not their version, but what he actually told them."

Despite these statements, defendant did not testify at trial. Defense counsel indicated that he had advised defendant not to testify, but asked the trial court to admonish defendant about his right to testify. The trial court asked defendant if it was his decision not to testify and if anyone forced this decision upon him. Defendant replied that it was his decision not to testify and that it was not forced on him. The trial court passed the case and admonished defendant a second time when it was recalled.

12

Defendant argues that his defense counsel was ineffective for failing to fulfill the promise made in opening statements that defendant would testify about what really happened. Defendant contends that this was deficient performance because it was unreasonable to break his promise to the jury that defendant would testify and defendant was prejudiced because defendant's failure to testify discredited him to the jury.

We need not reach the question of whether trial counsel's performance was deficient because we conclude that defendant failed to show prejudice such that the result of the proceeding would have been different. Here, the State's evidence was overwhelming. D.R. was attacked outside her home and sexually assaulted on the hood of her car. She testified that her attacker put a cold, hard object to her head and threatened to "blow [her] f---ing head off." The man placed his penis into her vagina. She immediately called the police. While she did not initially report a sexual assault in front of her son, she made an outcry when the police arrived at the scene. D.R. was examined and a sexual assault kit was collected at the hospital. Semen was found in both D.R.'s vaginal swabs and underwear. The DNA profile from the semen was matched to defendant.

After his arrest, defendant signed a Miranda waiver and told Detective Belcher and ASA Karas about the sexual assault. He admitted to following D.R. home after he saw her driving alone. He admitted to attacking her outside her apartment and forcing her to remove her pants and bend down over the hood of her car. Defendant admitted to placing his penis inside D.R.'s vagina against her will. He also admitted to taking D.R.'s purse and discarding items as he drove away. Multiple items from D.R.'s purse were recovered and admitted into evidence. Additionally, the State presented evidence of defendant's prior sexual assault of G.C.

Defendant has not shown how the outcome of the trial would have been different if he had testified or if his attorney had not promised that defendant would testify. If defendant had testified at trial, his testimony would be in conflict with D.R.'s testimony and defendant's own confession to Detective Belcher and ASA Karas. As the Schlager court noted, "the test is not whether defense counsel fulfilled all the promises he made during his opening remarks but, rather, whether defense counsel's errors were so serious that, absent those errors, the result of the proceeding would likely have been different." Schlager, 247 Ill. App. 3d at 932. In that case, the reviewing court declined to hold that the defense counsel's failure to fulfill his promise that the defendant and expert witnesses would testify amounts to *per se* prejudice. Schlager, 247 Ill. App. 3d at 932.

Defendant relies on the decisions in People v. Briones, 352 Ill. App. 3d 913 (2004), and People v. Chandler, 129 Ill. 2d 233 (1989). Both cases are distinguishable from the facts present in this case. In Briones, the reviewing court found the defense counsel's performance to be deficient after reneging on the promise that defendant would testify. The court also found defense counsel to be ineffective for allowing an improper jury instruction to be given. However, the reviewing court found the defendant to have been prejudiced based on the "aggregate errors of defense counsel," the evidence was not overwhelming, and the crux of the State's case involved the victims' identification of the defendant in low light. Briones, 352 Ill. App. 3d at 921. In Chandler, the defense counsel failed to subject the State's case to any meaningful adversarial testing. There, the defendant's attorney did not cross-examine several of the State's witnesses, failed to understand the law of accountability and felony murder when he admitted the defendant's guilt to burglary, and did not present the defendant's testimony after a promise in opening

14

statements. Chandler, 129 Ill. 2d at 248-49. The supreme court noted that as a result of the defense counsel's ineffectiveness, the jury "was forced to convict defendant of the offenses charged." Chandler, 129 Ill. 2d at 250. In this case, the evidence of defendant's guilt was overwhelming.

Here, any error by the defense counsel was not serious enough to undermine the proceedings such that the result would be different. Since defendant cannot establish prejudice under the Strickland test, his claim of ineffective assistance must fail.

Defendant next raises two challenges against section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2006)). First, defendant argues that evidence of his prior aggravated criminal sexual assault conviction was improperly admitted because the prior sexual assault was too distant in time, substantial differences existed between the facts of both sexual assaults, and the prejudicial effect outweighed its probative value. Second, defendant asserts that section 115-7.3 violates his constitutional right to due process.

The Illinois Supreme Court has dictated that cases should be decided on nonconstitutional grounds whenever possible, and constitutional issues should be decided only as a last resort. In re E.H., 224 Ill. 2d 172, 178 (2006). Therefore, we first consider defendant's contention that the admission of the other crimes evidence was improper because the proximity in time was too great, the lack of factual similarities between the two offenses, and the prejudicial effect outweighed the probative value. The State maintains that the other crimes evidence was properly admitted because the present assault occurred less than six years after defendant was released from custody, the assaults were substantially similar to each other, and defendant raised a consent defense. "We will not reverse the trial court's decision to admit other-crimes evidence unless we

15

find that the court abused its discretion." People v. Donoho, 204 Ill. 2d 159, 182 (2003).

Section 115-7.3 allows, in specified sex and sex-related offenses, for the admission of evidence of the defendant's commission of a similar offense and "may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3 (West 2006). The supreme court has held that a trial court is permitted to admit other crimes evidence "to show defendant's propensity to commit sex offenses if the requirements of section 115-7.3 are met." Donoho, 204 Ill. 2d at 176. The statute further provides that the trial court, in weighing the probative value of the other crimes evidence against undue prejudice to the defendant, may consider: (1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; and (3) other relevant facts or circumstances. 725 ILCS 5/115-7.3(c) (West 2006). "The key to balancing the probative value of other-crimes evidence to prove propensity against its prejudicial effect is to avoid admitting evidence that entices a jury to find defendant guilty '*only* because it feels he is a bad person deserving punishment.' " (Emphasis in original.) People v. Ross, 395 Ill. App. 3d 660, 674 (2009), quoting People v. Childress, 338 Ill. App. 3d 540, 548 (2003).

Prior to trial, the State filed a motion to admit other crimes evidence, specifically evidence regarding defendant's prior conviction for aggravated criminal sexual assault. Following a hearing, the trial court granted the State's motion and allowed the admission of the other crimes evidence. In its ruling, the trial court expressed the need to "use caution in considering the admissibility of other-crimes evidence to show propensity, and I need to engage in meaningful assessment of the probative value versus the prejudicial impact of the evidence." The court then engaged in a significant discussion of the factual similarities it found between the two crimes

16

before granting the State's motion. At trial, the State presented the testimony of Tardy, the detective who investigated the case, and G.C., the victim in the aggravated criminal sexual assault. The sexual assault occurred in November 1994. Defendant pled guilty and was released from prison in September 1999.

Defendant asserts that the previous crime was too remote to the current offense and the two offenses are too different to be admissible under section 115-7.3. The supreme court in Donoho "decline[d] to adopt a bright-line rule about when prior convictions are *per se* too old to be admitted under section 115-7.3. Instead, it is a factor to consider when evaluating its probative value." Donoho, 204 Ill. 2d at 183-84. We note that the Donoho court held that a 12- to 15-year time gap between offenses, alone, was insufficient to render the admission of a prior offense an abuse of discretion. Donoho, 204 Ill. 2d at 184. Here, the prior offense occurred nearly 11 years before the current one, but if we discount the time defendant was in prison, the gap in time is less than six years. We do not believe the gap of six years renders the prior offense too remote as to be an abuse of discretion on this factor alone.

In regard to factual similarities, there must be some threshold similarity to be admissible under section 115-7.3. Donoho, 204 Ill. 2d at 184. "As factual similarities increase, so does the relevance or probative value." People v. Wilson, 214 Ill. 2d 127, 142 (2005). However, when the evidence is offered for some purpose other than *modus operandi*, " 'mere general areas of similarity will suffice' to support admissibility." Donoho, 204 Ill. 2d at 184, quoting People v. Illgen, 145 Ill. 2d 353, 372-73 (1991).

We find that the facts of the 1995 sexual assault of G.C. are sufficiently similar to the facts present in the sexual assault of D.R. Both attacks occurred after midnight while the women were

17

alone. G.C. was attacked in a parking lot as she unlocked her car while D.R. was attacked as she was unlocking the door to her apartment building. Both women were moved to a secluded location. We recognize that G.C. was driven to a remote location while D.R. was walked to her car, which faced a wooded area. Both women were told to remove their pants and underwear. Both women were told or positioned to face away from defendant, G.C. was over the back of the seat and D.R. was facing backwards on the hood of her car. Evidence was presented that both women were threatened with what they believed to be a gun. A replica lighter was recovered in the present case and the trial court noted on the record that "a toy silver plastic revolver" was recovered in the prior case. Defendant never displayed a gun to either woman, but threatened them with its presence to force them to comply. Defendant talked to both women during the attack, asking in one case if she "liked it" and in the other if it "felt good." Defendant tried to prevent either woman from seeing his face. Both women had their purses stolen after the sexual assault.

Defendant asserts that the similarities between the two cases are generic and common to many sex crimes. He also points to some differences. He notes that the victims' ages were 15 years apart. However, the age of each victim was close to defendant's age at the time of the attack. In 1994, G.C. was 20 or 21 and defendant was 17, while in 2005, defendant was 28 and D.R. was 36. Defendant also points out the difference in the length of the attacks. G.C. testified that her assault "seemed like forever. It may be half hour [*sic*]," while D.R. stated that her assault lasted five to six minutes. We do not find this difference to be significant as neither victim knew exactly how long the sexual assault lasted. G.C.'s testimony that "it seemed like forever" indicated that she did not have a perception of how long it lasted.

18

1-08-3052

Finally, defendant argues that the difference in the type of penetration is a "crucial difference." G.C. was digitally penetrated, but defendant inserted his penis in D.R.'s vagina. We recognize this difference, but as previously noted, both women were assaulted in the same position—bent over with penetration from behind. The difference in the type of penetration does not render the other factual similarities meaningless. "The existence of some differences between the prior offense and the current charge does not defeat admissibility because no two independent crimes are identical." Donoho, 204 Ill. 2d at 185, citing People v. Illgen, 145 Ill. 2d 353, 373 (1991).

We conclude that the other crimes evidence was sufficiently similar to be admissible and probative toward defendant's propensity to commit sex crimes. The trial court stated on the record that it considered the arguments and the relevant case law before it weighed the prejudicial impact of the evidence against its probative value. Accordingly, we find that the trial court did not abuse its discretion in admitting evidence of defendant's sexual assault of G.C.

Defendant further argues that he was prejudiced by the admission because his defense counsel "was removed because of this error." Defendant was represented by Robert Parchem. Parchem had previously worked as an assistant State's Attorney and had prosecuted defendant in his prior aggravated criminal sexual assault case. After the trial court granted the State's motion to allow other crimes evidence, Parchem voluntarily withdrew from defendant's case due to this conflict of interest. Defendant asserts that this was prejudicial and he was denied a fair trial. We disagree. We have already concluded that the trial court did not abuse its discretion in allowing the other crimes evidence, and Parchem's voluntary withdrawal due to a conflict of interest was proper. Defendant received new representation and was not deprived of his right to counsel.

19

We turn next to defendant's constitutional challenge of section 115-7.3. Specifically, defendant argues that section 115-7.3 violates his due process rights because it alters the court system into a general investigation of defendant's propensities.

A statute is presumed constitutional, and the party challenging the statute bears the burden of demonstrating that it is unconstitutional. Donoho, 204 Ill. 2d at 177; see also People v. Walden, 199 Ill. 2d 392, 394 (2002). A court has a duty to construe a statute in a manner that upholds its validity and constitutionality if it can be reasonably done. People v. Malchow, 193 Ill. 2d 413, 418 (2000). Whether a statute is constitutional is a question of law that we review *de novo*. Malchow, 193 Ill. 2d at 418.

In Donoho, the supreme court held that section 115-7.3 does not violate the equal protection clause of the federal and state constitutions. Donoho, 204 Ill. 2d at 178. The Donoho court noted that section 115-7.3 is based on Federal Rules of Evidence 413 and 414, which also allow the admission of evidence of sexual assault or child molestation crimes to show propensity. Donoho, 204 Ill. 2d at 177. The court considered two federal cases holding that Federal Rules of Evidence 413 and 414 passed the rational basis test as sexual offenders are not a suspect class. Donoho, 204 Ill. 2d at 177. The court concluded that, like Rules 413 and 414, section 115-7.3 passed the rational basis test.

> "Under Mound and Castillo, we find that section 115-7.3 does not
> violate the federal equal protection clause. We agree that this
> provision passes the rational basis test because it also promotes
> effective prosecution of sex offenses and strengthens evidence in
> sexual abuse cases. Because we apply the same equal protection

20

> analysis under both the federal and state constitutions [citation], we also find that section 115-7.3 does not violate our state equal protection clause." Donoho, 204 Ill. 2d at 178, citing United States v. Mound, 149 F.3d 799, 801 (8th Cir. 1998), and United States v. Castillo, 140 F.3d 874, 883 (10th Cir. 1998).

While the defendant in Donoho did not challenge section 115-7.3 as a violation of due process, the supreme court still addressed this issue.

> "Defendant concedes that no fundamental right is involved in this case. In addition, courts have held that admitting other-crimes evidence does not implicate the due process right to a fair trial where the evidence is relevant and its probative value is not outweighed by its prejudicial effect (see, *e.g.*, [Castillo, 140 F.3d at 883] (analyzing Federal Rule of Evidence 414)); these two limitations are incorporated into section 115-7.3 (725 ILCS 5/115-7.3(b), (c) (West 2000))." Donoho, 204 Ill. 2d at 177.

Two appellate decisions have interpreted this statement as the Donoho court's implicit "belief that section 115-7.3 does not violate due process." People v. Beaty, 377 Ill. App. 3d 861, 883 (2007); see also People v. Dabbs, 396 Ill. App. 3d 622, 627 (2009), *appeal allowed*, 236 Ill. 2d 516 (2009). The Fifth District in Beaty, citing United States v. LeMay, 260 F.3d 1018 (9th Cir. 2001), noted that Rules 413 and 414 did not violate due process. Beaty, 377 Ill. App. 3d at 884. The court concluded:

> "Accordingly, for the same reasons that Rules 413 and 414 (Fed.

21

Rs. Evid. 413, 414) are constitutional on their face, so, too, is section 115-7.3, and as long as the trial court properly balances the probative value of the evidence against its prejudicial effect, as did the trial court in the present case, the admission of the evidence does not violate due process." Beaty, 377 Ill. App. 3d at 884.

See also LeMay, 260 F.3d at 1027; Donoho, 204 Ill. 2d at 177.

In Dabbs, the Third District relied significantly on Beaty and reached the same conclusion. Dabbs, 396 Ill. App. 3d at 627-28. "Those rules do not violate due process as long as trial judges are required to weigh the probative value versus prejudicial effect of the evidence so that they retain the authority to exclude potentially devastating evidence." Dabbs, 396 Ill. App. 3d at 627; see LeMay, 260 F.3d at 1027; United States v. Enjady, 134 F.3d 1427, 1430-35 (10th Cir. 1998 We agree with the conclusion reached in Beaty and Dabbs. Section 115-7.3 does not violate due process as the trial court retains the discretion to weigh the probative value against the prejudicial effect and to refuse to allow prejudicial evidence. Accordingly, section 115-7.3 is constitutional.

Next, defendant contends that the trial court erred in admitting evidence that police recovered a pistol shaped lighter because the lighter was found in a car that did not belong to defendant and was not identified as being used in the offense. The State responds that defendant has forfeited this issue as no objection was raised at trial nor was it presented in a posttrial motion. We agree.

To preserve an issue for review, defendant must object both at trial and in a written posttrial motion. People v. Enoch, 122 Ill. 2d 176, 186 (1988). Failure to do so operates as a forfeiture as to that issue on appeal. People v. Ward, 154 Ill. 2d 272, 293 (1992). Defendant

22

only makes a single passing reference to the plain error rule in the reply brief, but does not discuss the rule nor how it applies in the instant case. This reference is not sufficient to raise the plain error rule on appeal and it is forfeited. See People v. Nieves, 192 Ill. 2d 487, 503 (2000) (finding that the failure to argue "that the evidence was closely balanced nor explains why the error is so severe that it must be remedied to preserve the integrity of the judicial process" waived plain error on appeal); 210 Ill. 2d R. 341(h)(7). Since defendant failed to preserve this issue on appeal and does not sufficiently raise the plain error rule as a basis for our review, we find this issue to be forfeited.

Next, defendant asserts that his conviction for aggravated criminal sexual assault must be reduced to criminal sexual assault because the State failed to prove beyond a reasonable doubt that defendant acted in a manner which threatened or endangered a life as required under section 12-14(a)(3) of the Criminal Code of 1961 (720 ILCS 5/12-14(a)(3) (West 2004)). The State maintains that it presented sufficient evidence for a jury to find that defendant acted in such a manner as to threaten or endanger the life of D.R.

When this court considers a challenge to a criminal conviction based upon the sufficiency of the evidence, it is not our function to retry the defendant. People v. Hall, 194 Ill. 2d 305, 329-30 (2000). Rather, our inquiry is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); accord People v. Cox, 195 Ill. 2d 378, 387 (2001). It is the responsibility of the trier of fact to "fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic

facts to ultimate facts." Jackson, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789.

It follows that where the finding of guilt depends on eyewitness testimony, a reviewing court must decide whether, in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt. In conducting this inquiry, as noted, the reviewing court must not retry the defendant. People v. Cunningham, 212 Ill. 2d 274, 279-80 (2004). The reviewing court must carefully examine the record evidence while bearing in mind that it was the fact finder who saw and heard the witnesses. Cunningham, 212 Ill. 2d at 280. Testimony may be found insufficient under the Jackson standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. Cunningham, 212 Ill. 2d at 280. However, the fact a judge or jury did accept testimony does not guarantee it was reasonable to do so. Reasonable people may on occasion act unreasonably. Therefore, the fact finder's decision to accept testimony is entitled to great deference but is not conclusive and does not bind the reviewing court. Cunningham, 212 Ill. 2d at 280. Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside. Hall, 194 Ill. 2d at 330.

To prove aggravated criminal sexual assault, the State must prove that defendant committed criminal sexual assault while "act[ing] in such a manner as to threaten or endanger the life of the victim or any other person." 720 ILCS 5/12-14(a)(3) (West 2004). Defendant contends the State's evidence was insufficient to prove the aggravating factor because it showed that the offender verbally threatened D.R., but did not commit any life-threatening acts during the sexual assault.

In support, defendant relies on People v. Singleton, 217 Ill. App. 3d 675 (1991), as

support for his argument. In Singleton, the defendant sexually assaulted his minor daughter. The evidence at trial showed that the defendant had a pattern of domestic violence against his wife, the victim's stepmother; and his children such that the victim believed the defendant would harm her if she did not comply. However, the reviewing court found that "none of these acts occurred at the time of the defendant's sexual penetration of the [victim]" and the defendant's act of pushing the victim onto the bed was not viewed as a life-threatening act. Singleton, 217 Ill. App. 3d at 687. The court held that "it must be overt acts by the defendant, and not verbal threats, which endanger or threaten a victim's life, and that the life-threatening acts must occur during the commission of the offense." Singleton, 217 Ill. App. 3d at 687. As a result, the Singleton court concluded that the evidence failed to prove aggravated criminal sexual assault. Singleton, 217 Ill. App. 3d at 687.

We find Singleton to be distinguishable from the present case. Unlike the defendant in Singleton, defendant used the threat of a weapon to force D.R. to comply. Here, defendant attacked D.R. from behind as she was unlocking the door to her building. He pulled her down to the ground, put his arm over her mouth, and held a cold hard metal object to D.R.'s head. He made her feel it and she believed it was a gun. Defendant then told D.R. that if she screamed or fought, he would "blow [her] f---ing head off." He walked her to her car while the object D.R. believed was a gun was still pressed to her head. He bent her over the hood of her car, had her remove her pants and underwear, and then placed his penis in her vagina. After he was finished, defendant made D.R. stand in the woods and count to 20. He again said that if she stopped counting or moved, he would "blow [her] head off." This evidence showed that defendant acted in a manner to threaten D.R.'s life. Defendant committed an overt act to threaten D.R.'s life

25

when he placed on object to D.R.'s head and threatened to "blow [her] brains out" if she did not comply. After viewing all of the evidence presented in the light most favorable to the State, we conclude that a rational trier of fact could have concluded that defendant acted in such a manner as to threaten or endanger D.R.'s life and find defendant guilty of aggravated criminal sexual assault.

Finally, defendant contends that the cumulative effect of the alleged trial errors deprived him of a fair trial. While individual trial errors may have the cumulative effect of denying a defendant that right, no such accumulated error occurs where none of the separate claims amounts to reversible error. People v. Dresher, 364 Ill. App. 3d 847, 863 (2006). Because we have rejected each of defendant's arguments, as set out above, his cumulative error argument necessarily fails as well.

Based on the foregoing reasons, we affirm defendant's conviction and sentence.

Affirmed.

R.E. GORDON, J., concurs.

PRESIDING JUSTICE GARCIA, specially concurring:

I agree completely with Justice McBride's opinion. I write separately to answer the defendant's claim that defense counsel was incompetent in promising to the jury that the defendant would testify and then advising the defendant not to take the stand. Defense counsel's representation was not deficient because the record sufficiently demonstrates that "sound trial strategy required [defense counsel] to break [his] promise that the defendant would testify." People v. Briones, 352 Ill. App. 3d 913, 919, 816 N.E.2d 1120 (2004). When a defendant is called to decide whether to testify, defense counsel must be free to give an honest,

26

straightforward assessment of the adduced evidence without having defense counsel's performance labeled deficient should counsel's advice be contrary to a promise made to the jury in opening statements. Unlike Briones and the authorities cited therein that placed the explanation for the attorneys' broken promise that the defendants would testify on incompetence, here the record supports a finding that the promise made and broken were products of reasonable trial strategy.

When defense counsel told the jury that the defendant would testify that the "sexual conduct between himself and the victim" was not a crime, that promise stemmed from the defendant's claim that the victim "consented" to the defendant's sexual conduct. Defense counsel told that jury that the defendant and the victim knew each other, had consensual sex that night, and the defendant had prior "relations with the victim." The reasonable inference to be drawn from the record is that the genesis of those assertions lies with the defendant.

In light of the defense claimed by the defendant, it was reasonable for defense counsel to make the promise to the jury in his opening statement that the defendant would testify in an effort to keep the mind of the jury open during the State's case. When the time came for the defendant to fulfill the promise made on his behalf to the jury, defense counsel also acted reasonably in advising him not to testify in light of counsel's then assessment of the adduced evidence that the defendant would not benefit by testifying. See People v. Manning, 334 Ill. App. 3d 882, 892, 778 N.E.2d 1222 (2002) (defendant's claim of ineffectiveness of counsel claim rejected because defendant's decision not to testify was the result of trial strategy).

That the defendant did not take the stand and make his "consent" claims directly to the jury reflects nothing more than a change of mind by the defendant. At the conclusion of the

1-08-3052

State's case in chief, defense counsel was correct in his assessment that the defendant had little to gain by testifying. There is little likelihood the defendant's version would have held up to cross-examination. See People v. Garrett, 44 Ill. App. 3d 429, 437, 358 N.E.2d 364 (1976), quoting 5 J. Wigmore, Evidence §1367, at 32 (Chadbourn rev. ed. 1974) (according to Wigmore, cross-examination is " 'the greatest legal engine ever invented for the discovery of truth' "). If anything, his testimony would have made the jury's decision easier: with the defendant's "consent" testimony, the question before the jury would have been which of the two irreconcilable versions was credible. True, the defendant now claims he merely followed defense counsel's advice not to testify, but counsel's advice gave the defendant the opening he needed to extricate himself from his hopeless defense of consent.

While I agree that defense counsel should strive to demonstrate "in the record that *** sound trial strategy required [defense counsel] to break [his] promise that the defendant would testify" (Briones, 352 Ill. App. 3d at 919), I conclude the record supports such a finding here. Defense counsel's performance was not deficient either when he made the promise to the jury that the defendant would testify, based on the defendant's claim of consent, which must have originated with the defendant, or when counsel advised the defendant not to testify, based on defense counsel's then assessment that the defendant's version could not withstand cross-examination. Each decision by defense counsel was the product of reasonable trial strategy, though the change in strategy at the conclusion of the State's case in chief served different interests of the defendant than the promise of his testimony during opening statements.

That said, I believe either defense counsel or the trial judge, during the colloquy on whether the defendant would take the stand, should have remarked that his decision to forego

28

testifying would raise a conflict with the promise made to the jury during opening statements, an admonishment that might have gone a long way to rebutting the claim of ineffectiveness of trial counsel the defendant now makes before us.